UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MIGUEL PEREZ, et al.,

      Plaintiffs,

**CASE** No. 8:01-CV-0069-T-27MSS

    v.

PAVEX CORPORATION, a Florida corporation,

      Defendant.

---

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS L. ABRAHANTES, A. LLUBERES AND L. MARTINEZ FOR LACK OF SUBJECT MATTER JURISDICTION UNDER 42 U.S.C. §1981, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

In this case, Hispanic Plaintiffs Luis Abrahantes ("Abrahantes"), Alejandro Lluberes ("Lluberes") and Luis Martinez ("Martinez"), independent truck owner/operators who hauled asphalt to Pavex worksites between 1999 and 2000, join this lawsuit of African-American, white and Hispanic Pavex employees alleging widely different claims of discrimination under 42 U.S.C. §1981, despite having no contractual or employment relationship whatsoever with Pavex.[1] These plaintiffs have no standing to sue Pavex and should never have been joined in this lawsuit.

Plaintiffs sporadically hauled asphalt to Pavex worksites between 1999 and 2000 as independent contractor truck owner/operators when they chose to accept assignments from trucking companies that were not affiliated in any way with Pavex and did not have a contract with Pavex. Plaintiffs simply took hauling assignments (when they wanted to) from independent

---

[1] Five other Hispanic plaintiffs in this suit, Narciso Perez, Rafael Perez, Diosdado Perez, Isbel Perez, and Alejandro Vazquez-Falero, who delivered aggregate materials to Pavex, are also non-employees of Pavex. However, because N. Perez, R. Perez, D. Perez, I. Perez and Alejandro Vazquez-Falero allege totally different claims than these three plaintiffs, Pavex will address their claims by separate motion.

55

trucking companies that occasionally hauled asphalt for **Pavex**. Plaintiffs seek damages from Pavex because they claim that Pavex Paving Foreman Terry Overcash was on certain occasions that they hauled to his work site in 1999 and 2000. It is **undisputed** that these plaintiffs have no contractual or employment relationship with Pavex, which **mandates** their dismissal in this case under §1981. Further, the conduct of which these plaintiffs' **complaint** was sporadic and was addressed when a Complaint was made and, in any **even, despite** this conduct, Plaintiffs continued to voluntarily have for Pavex until medical **or work** events; entirely unrelated to Pavex, caused them to stop hauling asphalt.

## I.  Plaintiffs Have Burden of Proving Standing under §1981 under Rule 12(b)(1)

Whether a plaintiff has standing to sue is a threshold jurisdictional question. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998).[2] When a motion to dismiss for lack of subject matter jurisdiction is filed, the burden is **on the** nonmoving party to prove that he has properly invoked the jurisdiction of the Court. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980); *cert. denied*, 449 U.S. 953 (1980). In ruling on a Rule 12(b)(1) motion **to dismiss,** while the Court must accept as true all material allegations in the complaint, "'[e]mpirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated **facts,'** deserve no deference." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992). **Further, in** considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, **this Court** may consider matters outside

---

[2] While the appropriate procedural vehicle for raising lack of **standing based** upon the lack of a contractual relationship under 42 U.S.C. §1981 has not been directly decided in this **Circuit,** the Eleventh Circuit has held that a 12(b)(1) motion for lack of subject matter jurisdiction is the proper **procedural** method to raise lack of standing to sue under an employment discrimination statute. *See e.g., Scarfo v. Ginsberg*, 175 F.3d 957 (11th Cir. 1999) (holding that whether a defendant is an employer for purposes of a Title VII action is a threshold jurisdictional question appropriately decided by a 12(b)(1) motion to dismiss), *cert. denied*, 529 U.S. 1003 (2000); *see also Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (standing is a jurisdictional prerequisite to maintaining an action in federal court).

the pleadings without thereby converting the motion into a Rule 56 motion for summary judgment. *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993); James W. Moore, et al. *Moore's Federal Practice*, § 12.30[3] (3rd ed. 1997). In fact, consideration of matters outside the bare factual allegations of the pleadings is warranted in addressing a Rule 12(b)(1) motion, because it is necessary for a court to establish that it has jurisdiction as an absolute prerequisite to continuance of the action. *Capitol Leasing*, 999 F.2d at 191. "Obviously, if a plaintiff cannot establish standing to sue, relief from this court is not possible, and dismissal under 12(b)(1) is the appropriate disposition." *AFGE, Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999) (affirming in part dismissal of claim under statutes relating to government contracting based on lack of standing).

**II.     Section 1981 Requires the Existence of an Actual or Prospective Contract with the Defendant**

Section 1981, 42 U.S.C., guarantees that "all persons . . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). In 1991, Congress amended §1981 to provide that that the terms "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Where, as here, a plaintiff is *not employed* by the defendant,[3] the plaintiff must establish an actual or prospective contract *with the defendant* to have standing to sue under §1981. *See e.g.,*

---

[3] While courts use the same three-step *McDonnell Douglas* framework used in Title VII cases to analyze claims under 42 U.S.C. §1981, *see, e.g., Trotter v. Board of Trs. Of Univ. of Alabama*, 91 F.3d 1449, 1454 (11th Cir. 1996), the class of individuals protected under §1981 differs from those protected by Title VII. Title VII prohibits discrimination by an employer; §1981 prohibits discrimination in connection with the making or enforcement of a prospective or actual **contract** with the defendant. *See, e.g, generally Bishop v. Averra*, 177 F.3d 1233(11th Cir. 1999). While neither the Supreme Court nor the Eleventh Circuit has directly decided the issue of whether at-will employment constitutes a sufficient "contract" to support a claim under **§1981**, *see Bishop, supra*, a number of lower courts have held that the "contract" requirement of §1981 is fulfilled if the plaintiff is or was an employee of the defendant. *Id.* at 1233 and n.5 (stating that whether at-will employment can support a claim under §1981 has not been decided by the Eleventh Circuit, discussing split in lower courts, and leaving the question open).

*Hudson v. Raynor*, 1996 WL 172054 (E.D. Pa. 1996) ("**Because** …§1981 addresses the right to make, enjoy and enforce contracts, individuals who are not **parties** to the existing or prospective contract lack standing to sue). Here, plaintiffs Abrahantes **and Llube**res admit in their Amended Complaint that they "[were] not employed by defendant." (**Amended** Complaint at ¶¶ 110 and 131). While Martinez alleges in the Amended Complaint that **Pavex** employed him as a truck driver in 1999, he admitted during his deposition that **he was never** a Pavex employee. (Martinez at 60). It is further undisputed that these **plaintiffs have** no contractual relationship with Pavex. Thus, Plaintiffs have no standing to sue Pavex **and their** claims must be dismissed.

A.    **In the Absence of an Employment Relationship, Plaintiffs Must Prove a Contract between Themselves and Pavex; These Plaintiffs Have No Contracts with Pavex and thus No Standing**

Federal courts, including this Court, have routinely **dismissed** claims under §1981 where the plaintiff was neither an employee of nor a direct contracting **party** with the defendant. *Fareed v. Hillsborough County*, 1995 WL 224477 (M.D. Fla. 1995); *Wright v. Barrett*, 1996 WL 707109 (D. Kan. 1996) (plaintiff's claim under §1981 based on racially **hostile** comments of defendant's employees dismissed where plaintiff failed to establish that **he was** either an employee of or had a contract with defendant).

*Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8 (1st Cir. 1999), *cert. denied*, 528 US 1105 (2000), is instructive. One of the plaintiffs, Danco, **Inc., ma**intained parking lots and was owned by a Mexican-American named Guliani. *Id.* at 8. **Danco**, Inc.'s principal contracts were with Wal-mart which were ultimately terminated. *Id.* at 10-11. Both Guliani, as an owner/employee of Danco, Inc. and Danco Inc. itself brought §1981 claims against Wal-Mart. *Id.* Guiliani alleged that he had been subjected to three separate **instanc**es of racial discrimination by Wal-Mart employees. *Id.* at 10-11. The §1981 claims were **tried** before a jury. On appeal, the First Circuit held that **the** statutory language of §1981 **precluded** a §1981 claim by Guiliani

individually against Wal-Mart because he did not have a contract with Wal-Mart. *Id.* at 14. The court also rejected Guiliani's claim that he had some type of indirect contractual relationship with Wal-Mart because he was an owner/employee of Danco, Inc. and held that "[n]othing in section 1981 provides a personal claim, so far as its language is concerned, to one who is merely affiliated – as an owner or employee – with a contracting party that is discriminated against by the company that made the contract. *Id.* at 15. Though no relief could be had on this point because Wal-Mart had not raised this issue before the district court, the appeals court stated that if the issued had been joined, "Wal-Mart would likely have been entitled to an instruction that Guiliani had no claim of any kind under section 1981 because he had no contract." *Id.* at 16. The court further held that while a contracting corporation could bring a claim of damages for racial harassment of its employees, the employees cannot seek damages on their own behalf. *Id. at* 14. In fact, the court went as far as to state that "**letting any claim by Guiliani under section 1981 go to the jury was** an error [and] was arguably at least '**plain' error**." *Id.* at 15 (emphasis added). *See also, Hudson, supra* at *2 (individual plaintiffs employed by valet parking company lacked standing under §1981 to complain that country club had terminated contract with valet parking company on racial grounds because they were not parties to the existing, or any prospective, contracts); *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565, 1573 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068, *original opinion adopted on remand*, 975 F.2d 886 (D.C. Cir. 1992), *cert. denied*, 511 U.S. 1068 (1994) (a company's shareholder has no standing to bring a §1981 claim for interference with the making and enforcement of a contract to which the company, but not the shareholder, is a party).

In their Amended Complaint and depositions, these plaintiffs acknowledge that they were not employed by Pavex but claim they were truck owner/operators[4] who were independent contractor drivers for various trucking companies, including J & L, Margie Woods, Montgomery and Rinker, when they hauled asphalt to Pavex and other companies' worksites. (Abrahantes at 25, 46 and 47; Lluberes at 44 and 96; Martinez at 79 and 80). As in *Danco*, *Hudson*, and *Gerson*, these plaintiffs have no standing to sue Pavex for racial discrimination under §1981. Here, of course, unlike in those cases, the trucking companies for whom plaintiffs hauled asphalt to Pavex and other companies' worksites have not sued Pavex as a result of any kind of discrimination, and the trucking companies had no contract with Pavex.

**B.      Plaintiffs Are Not Intended Third Party Beneficiaries of any Contract with Pavex and any Trucking Company for whom they Hauled and, in any event, Third Party Beneficiaries Have no Standing Under §1981**

To the extent these plaintiffs may attempt to claim that they have standing to assert §1981 claims against Pavex as third party beneficiaries of the relationship between the various trucking companies for whom they hauled asphalt to Pavex worksites and Pavex, this argument would likewise fail.

In *North American Roofing & Sheet Metal Co., Inc. v. Building & Const. Trades Council*, 2000 WL 230214 *1 (E.D. Pa. 2000), the court held that even a subcontractor of a contracting party has no standing to a defendant who cancelled a contract with the defendant. In that case, the defendant hired plaintiff North American as a subcontractor to construct a public housing project. North American, in turn, subcontracted some of its work to ANVI. *Id.* After defendant canceled its contract with North American, North American, ANVI, and various employees of both companies brought claims against defendant under §1981 alleging race discrimination. *Id.*

---

[4]   Plaintiff Martinez worked for Plaintiff Abrahantes and drove Abrahantes' dump truck. (Martinez at 77, 80).

at 2. In granting a motion to dismiss, the court held that only North American had standing under §1981, because only North American had a direct contractual relationship with the defendant. *Id.* at 3. Those plaintiffs whose §1981 claims were dismissed argued that their claims should still survive dismissal because they were third party beneficiaries of the contract between North American and defendant as subcontractors of North American. *Id.* Applying Pennsylvania's test for third party beneficiary status, which is similar to Florida's[5], the court rejected the plaintiffs' third party beneficiary argument and held that the subcontractors and employees of the subcontractors were not third party beneficiaries of North America's contract with the defendant. *Id.*

Here, there is no contract from which to attempt to infer an intended third party beneficiary relationship. Moreover, even if these plaintiffs could establish that they were intended third party beneficiaries of some contract (which they cannot), intended third beneficiaries of a contract allegedly impeded on the basis of race have no standing to sue under §1981. *Sims v. Order of United Commercial Travelers of America,* 343 F. Supp. 112, 115 (D. Mass. 1972) (wives named as beneficiaries in applications by husbands for insurance refused allegedly because of race lacked §1981 standing, as wives had not sought to make contracts with defendant insurer).[6] Here, of course, again, it is undisputed that no contract affecting these plaintiffs was cancelled as a result of any conduct by Pavex.

---

[5]   A party claiming rights as a third party beneficiary to a contract must establish that the contract was established primarily for his benefit. *Jones v. Childers,* 1992 WL 300845, *12 (M. D. Fla. 1992). In Florida, to establish that one is an intended third party beneficiary of a contract, "the intention of the parties ...is to be deducted from the language employed [in the contract] and such an intention, when expressed, is controlling, regardless of intention existing in the minds of the parties" *Durham Tropical Land Corp. v. Sun Garden Sales Co*, 138 So. 21 (1931) *aff'd* 151 So. 327 (1932).

[6]   Further, incidental beneficiaries have no standing to sue to enforce their rights under a contract. *See International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service,* 400 F.2d 465, 471-472 (5th Cir. 1968); *see also Hudson, supra,* at *3 ("That a plaintiff may be able to claim some kind of incidental injury as a consequence of a defendant's refusal to contract with a third party does not confer standing" under §1981); *Benjamin v. Aroostook Medical*

### C.    Plaintiffs Admit that Pavex Was Not Their "Joint Employer"

To the extent these plaintiff attempt to claim (without pleading as such) that they were somehow "jointly employed" by Pavex, such claim would be without merit based on their own deposition testimony.  The Supreme Court of the United States, in *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964), recognized that the ultimate question in determining whether a wholly unrelated company may be considered a "joint employer" of another company's employees is whether the alleged joint employer "possessed sufficient <u>indicia of control</u> . . ." over the other company's employees to be considered an employer. (Emphasis added.).[7]

Here, the joint employment theory has no application whatsoever as it is undisputed that Pavex lacked any of the indicia of control over these plaintiffs needed to establish joint employer status under any test.   Indeed, these plaintiffs were independent contractors of the various trucking companies for whom they hauled asphalt to Pavex and other companies' worksites. Plaintiffs have no employment relationship whatsoever with Pavex.  Courts have determined that a plaintiff may not be covered under an employment statute where he/she is not an employee but rather an independent contractor.  Factors to be considered under this inquiry are: (1) ownership of the equipment necessary to perform the job; (2) responsibility for costs associated with operating that equipment and for license fees and taxes; (3) responsibility for obtaining insurance; (4) responsibility for maintenance and operating supplies; (5) ability to influence

---

*Center, Inc.*, 57 F.3d 101, 106 (1st Cir. 1995) (patients of doctor whose contract was allegedly cancelled by hospital had no standing to sue under §1981).

[7]   The United States Courts of Appeals have emphasized a number of factors which are relevant to the factual determination of whether an entity exercises sufficient control over employees to be a joint employer.  The Seventh Circuit has noted the relevance of "such factors as [1] the supervision of the employees' day to day activities, [2] authority to hire or fire employees, [3] promulgation of work rules and conditions of employment, [4] work assignments, and [5] issuance of operating instructions." *DiMucci Construction Co. v. N.L.R.B.,* 24 F.3d 949, 953 (7th Cir. 1994).  The Second Circuit has emphasized five factors: (1) hiring and firing; (2) discipline; (3) pay, insurance and records; (4) supervision; and (5) participation in bargaining with employees.  *Clinton's Ditch Co-op Co., Inc. v. N.L.R B.,* 778 F.2d 132, 138-39 (2d Cir. 1985), *cert denied,* 479 U.S. 814 (1986).

profits; (6) length of job commitment; (7) forms of payment; and (8) directions on schedules and performing work. *See Broussard v. Dayton-Hudson Corp.*, 789 F.2d 1158, 1160 (5th Cir. 1986).

Plaintiffs admit in their depositions that they made deliveries of asphalt to many other companies' worksites besides Pavex worksites. They further admit (1) Pavex never called them directly to give them assignments; (2) they used only their own equipment (their trucks) to make deliveries and never operated the machine into which they dumped the asphalt (the Paver) and never got out of their trucks at the Pavex worksites, even when they spilt asphalt, because their insurance would not cover them for anything that may happen outside of their trucks; (3) Plaintiffs were paid by the trucking companies for whom they made the deliveries of asphalt to Pavex worksites; and (4) Pavex did not pay for the insurance on their trucks or maintain them. (Abrahantes at 46-47, 50-51, 65-67, 123, 127; Lluberes at 40-41, 59-60, 62-63, 97, 139, 180; Martinez at 81). From their deposition testimony, it is clear that the *only* thing Pavex controlled about their work was that Plaintiffs were required to dump the asphalt into the Paver at the worksite. Clearly, these plaintiffs cannot conceivably be considered employees of Pavex. *See e.g., Cole v. Ventura Transport, Inc.*, 2000 WL 335743 *3 (E.D.La 2000), where court held that plaintiff/truck driver was not employee of defendant under Title VII but instead was independent contractor[8] where (like plaintiffs here), plaintiff (1) owned the truck necessary to perform her job; (2) was responsible for the costs associated with operating her equipment and for license fees and taxes; (3) was responsible for her own maintenance insurance and operating supplies; (4) "most important, although Venture directed when and where plaintiff picked up and delivered cargo, plaintiff alone controlled the manner and means in which she performed her work, including the method of transport, the operation of her vehicle, the route selected, and the

---

[8] Of course, these plaintiffs were not even independent contractors of Pavex. Instead, plaintiffs were independent

selection, hiring and firing of drivers."

Thus, based on their testimony alone, these plaintiffs have no claim of joint employment or employment of any kind with Pavex and their claims must be dismissed. *See also, Fareed, supra* (where this Court dismissed plaintiff's claims under §1981 against one of the defendants where plaintiff failed to establish that he was a joint employee of that defendant where defendant exercised no control over the employee's work).

**D.   To the Extent Plaintiffs Attempt to Assert Standing Based upon Interference with Their Contracts with Independent Trucking Companies, Plaintiffs Admit No Interference as a Result of any Action by Pavex**

Plaintiffs appear to base their claim of standing in this case on a claim that Terry Overcash's conduct somehow interfered with their contracts with the various trucking companies for whom they made deliveries of asphalt to Pavex and other companies' worksites. First, it is highly questionable whether standing may be conferred under §1981 because of a claimed interference by a defendant with the plaintiff's contract with a third party. *See, e.g., Fareed, supra* (where this Court dismissed plaintiff's claim for interference with his employment "contract" by a third party). Regardless, these plaintiffs' deposition testimony make clear that Pavex *did not in fact* interfere with their contracts with outside trucking companies. To the contrary, they testify that they continued to make deliveries to Pavex and other companies after Overcash allegedly made disrespectful comments to plaintiffs (Abrahantes at 161-164; Lluberes at 87, 93-94, 133; Martinez at 153).[9] *See, e.g. Bellows v. Amoco Oil Co.*, 118 F.3d 268 (5th Cir.

---

contractor owner/operators of the trucking companies for whom plaintiffs delivered asphalt to Pavex and other companies' worksites.

[9] Abrahantes made deliveries for Pavex until at least May 2000 and made deliveries for other asphalt companies as well until Abrahantes had an accident changing a tire on the side of the road in December 2000 that resulted in a collapsed lung and heart problems, which prohibited him from continuing to work. (Abrahantes at 28, 161-164). Lluberes continued to make delivers to Pavex worksites and other companies' worksites until his doctor recommended that he not drive because Lluberes lost his vision in his right eye. (Lluberes at 12, 17, 133). Martinez made deliveries for trucking companies until he left the area in 2000 to work the sugar cane harvest. (Martinez at 153).

1997) (wherein Fifth Circuit rejected argument that plaintiffs have standing to sue under §1981 for interference with contracts with a third party and further held that, even if such could state a claim under §1981, where plaintiff's contract was unchanged with third party, plaintiff had no cognizable claim under §1981), *cert. denied*, 522 US 1068 (1998). *Morris v. Office Max, Inc.,* 89 F.3d 411, 414 (7th Cir.1996) (stating that "[a] claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest").  Not only do Plaintiffs admit that they continued to deliver asphalt to Pavex worksites and to other companies' worksites, Plaintiffs make no allegation that their contracts with the trucking companies for whom they made deliveries of asphalt to Pavex and other companies' worksites were ever changed or terminated because of any conduct by Pavex.  Thus, even if Plaintiffs' contracts with the independent trucking companies could somehow confer standing upon them if Pavex had forced the trucking companies to terminate their contracts with these plaintiffs because they are Hispanic, it is undisputed that *this never* occurred.  Dismissal is clearly warranted.

## III.   ALTERNATIVELY, SUMMARY JUDGMENT IS WARRANTED

As shown, *supra,* Plaintiffs have no standing to sue for a hostile work environment created by Pavex' employees under §1981.  *See Wright, supra* (plaintiff's claim under §1981 based on racially hostile remarks allegedly made by defendant's employees was dismissed where plaintiff failed to establish that he was either an employee of or had a contract with defendant); *Danco, supra* (where court held that Hispanic plaintiff's claim for hostile environment that included parking lot spray-painted with "White Supremacy," negative comment about Hispanics by one of defendant's employees and physical fight with same employee where employee threatened to "rip [plaintiff's] head off," was subject to dismissal under §1981 because plaintiff was not an employee or contractee of the defendant).   Further, Plaintiffs cannot produce

sufficient evidence to withstand summary judgment on the merits on the grounds that they were subjected to a hostile environment or treated differently because of their ancestry or race.

**A.    Plaintiffs Were Not Subjected to a Hostile Environment**

It is difficult to conceptualize how anti-discrimination statutes related to employment may be analogized to these §1981 claims where no conceivable indicia of employment exists. However, generally, courts look to cases under Title VII in evaluating hostile work environment claims under §1981.  To establish a claim for hostile environment under Title VII, and thus under §1981, a Hispanic plaintiff must present credible evidence that: (1) he was subject to unwelcome harassment; (2) the harassment complained of was based on ancestry or race; (3) the harassment affected a "term, condition, or privilege" of employment in that it was "sufficiently severe and pervasive to alter the condition of his employment and create an abusive working environment;" and (4) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245-46 (citing and quoting, *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986) (other citations omitted) (11th Cir. 1999), *cert. denied,* 529 U.S. 1068 (2000) (sitting *en banc*).  The Eleventh Circuit, *en banc,* has directed that "[m]otions for summary judgment. . .are appropriate to 'police the baseline for hostile environment claims.'" *Mendoza,* 195 F.3d at 1244.  In this case, Plaintiffs cannot establish any of these elements and summary judgment is appropriate.  Moreover, their allegations fall short of the "baseline" established by *Mendoza.*

**1.    The Conduct of which Plaintiffs Complain Does Not Rise to the Level of a Hostile Environment**

The alleged harassment as testified to by all of these plaintiffs consists primarily of one Paving Foreman, Terry Overcash, cursing at them when they dumped asphalt at Pavex worksites, by using terms such as "fuck you," "motherfucker," and "son of a bitch" and "stupid" sometimes

preceded or followed by the word "Cuban" (Abrahantes at 127-129, 131, 134-136; Lluberes at 71-73, 162-163, 170; Martinez at 113-114, 119-120, 126-128, 141-143).  Because these plaintiffs claim to understand virtually no English, they could not testify to the context of comments, but did testify that Overcash cursed at them when they made mistakes dumping the asphalt, including backing their trucks in the wrong direction and spilling asphalt, which they refused to pick up (Lluberes at 165-166, 174, 176; Martinez at 113-114, 124).

The conduct of which Plaintiffs complain is not sufficiently severe or pervasive to create a hostile environment.  To establish an abusive or hostile environment, a plaintiff must show, based on "all the circumstances," that a reasonable person would find the environment "hostile or abusive" and that they were subjectively offended by the comments or conduct.[10]  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993); *Mendoza*, 195 F.3d at 1246.[11]  Given that the conduct of which they complain admittedly occurred on two to four occasions (at most) sporadically only when they interacted with Terry Overcash, such conduct fails to meet any reasonable standard of frequency.  Nor is the conduct of which they complain sufficiently severe or frequent when viewed against the *Mendoza* baseline.  The United States Supreme Court recently stated that "[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark County Sch. Dist. v. Breeden*, 121 S.Ct. 1508, 1510 (2001) (citing *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998)).

---

[10] Throughout Plaintiffs' deposition testimony, Plaintiffs constantly referred to Pavex employees or other independent contractor drivers by their nationality, describing them as "that Mexican," "the Cuban" and "the Americans." (Abrahantes at 30, 39; Lluberes at 69, 80 and 81; Martinez at 153, 181). Thus, it is clear that Plaintiffs were not subjectively offended when they were referred to as "Cuban." Rather, Plaintiffs apparently were offended when Overcash cursed at them.

[11] The Eleventh Circuit has identified four factors to consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Mendoza* at 1246 (citations

Indeed, where the alleged harassment, even if derogatory in nature, is infrequent and at irregular intervals, it is not severe or pervasive enough to create an objectively hostile or abusive work environment as a matter of law. *Harris*, 510 U.S. at 21.

Further the Supreme Court has emphasized that allegations of harassment must be taken in the appropriate context — behavior that may be considered offensive in a white-collar environment may be acceptable, and even commonplace,[12] in a blue-collar warehouse or construction site (like Pavex worksites). *Oncale v. Sundowner Offshore Svcs.*, 118 S. Ct. 998, 1003 (1998). Thus, in *Weinsheimer v. Rockwell Int'l Corp.*, 754 F. Supp. 1559, 1566 (M.D. Fla. 1990), *aff'd*, 949 F.2d 1162 (11th Cir. 1991), allegations that, *inter alia*, male coworker in a shop environment repeatedly asked plaintiff several times a week to "suck him" or "give him head," once pointed to her crotch and said "Give me some of that stuff," grabbed at plaintiff's crotch and breast, passed gas and belched in her presence, did not rise to level of "sufficiently severe" to state a hostile environment claim, where all of allegations were consistent with the general environment in the back shop where plaintiff worked. The Eleventh Circuit has held that racial slurs must be so "commonplace, overt and denigrating that they create an atmosphere charged with racial hostility." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995), *citing EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990).

In a recent case alleging national origin harassment much more severe than the allegations in this matter, the court held that the alleged harassment by a supervisor was not sever enough to create a hostile environment. *Citroner v. Progressive Casualty Ins. Co.*, 2002 WL 1276700, *9 (E.D. N.Y. June 5, 2002). In *Citroner* the plaintiff alleged that his supervisor

---

omitted).

[12]   In fact, Plaintiffs demonstrated that it is commonplace in their line of work to refer to a person by their national origin, as Plaintiffs repeatedly referred to people they did not know by that person's national origin, including "that Mexican," "the Cuban" and "the Americans" during their depositions. *Supra* note 10.

engaged in the following conduct:

> [Plaintiff's supervisor] mocked the Spanish language, left a Speedy
> Gonzalez doll on plaintiff's desk and referred to plaintiff as Speedy
> Gonzalez; told plaintiff either once or several times (plaintiff's
> testimony is inconsistent) to act more white and loose his cocky
> Spanish attitude; and passed gas one time near his face and made a
> comment about Hispanics and beans.  Plaintiff also states that [the
> defendant's office manager] told him to act more white on two
> occasions.  Finally, plaintiff claimed that [the defendant's office
> manager] referred to him as a "spic" on one occasion, and that
> [plaintiff's supervisor] used the same term on an unstated number
> of occasions.

Despite these claims, the court granted the defendant's motion for summary judgment and stated

that, "a reasonable jury could not conclude that there was one incident that was extraordinarily

severe or that this 'series of incidents was sufficiently continuous and concerted to have altered

the conditions of [plaintiff's] working environment.'"  *Id.*(citing *Whidbee v. Garzarelli Food

Specialties, Inc.*, 223 F.3d 62, 69 (2nd Cir. 2000)).

Further, the court in *Vigil v. City of Las Cruces*, 113 F.3d 1247, 1997 WL 265095, *3

(10th Cir. 1997), held that the plaintiff's claims that supervisors referring to her as "wetback"

and evidence of discrimination against Hispanic customers was not enough to establish a case of

harassment where the plaintiff (like Plaintiffs here) only made conclusory allegations regarding

the frequency of such harassment.  In *Vigil*, the plaintiff only stated that her supervisor

"frequently" used derogatory language and that her supervisor treated Hispanic customers poorly

from October of 1992 through March 1993.  *Id.*  In granting the defendant's motion for summary

judgment, the court stated that "[w]ithout greater specificity, such conclusory allegations are

insufficient to support a finding of 'a steady barrage of opprobrious'" harassment.  *Id.*

Similarly, in *Stacy Mitchell, et al. v. Carrier Corp.*, 954 F. Supp. 1568 (M.D. Ga. 1995),

*aff'd* 108 F.3d 343 (11th Cir. 1997), the court held that the plaintiff failed to prove a racially

harassing work environment even though he alleged the existence of racial epithets consisting of

"Woody Wilson -- Nigger Ape," "Nigger," and "Niggers go home to Africa." *Id* at 1574. Some of these epithets were written on the walls of the bathroom along with other racist graffiti that remained for months despite complaints to management. *Id.* The plaintiff also alleged the existence of rebel flags and "KKK" initials drawn on documentation that was affixed to refrigeration units. *Id.* Additionally, plaintiff alleged that a co-worker had made a statement to the effect that "'there were 'niggers' on their shift who thought that they (black employees) were going to run the shift and that he wouldn't allow that.'" *Id.* at 1576. The court stated that although "[t]he discriminatory conduct described by plaintiff is unquestionably humiliating, ... and would be offensive to a reasonable person ... considering these incidents collectively, they simply are 'not sufficiently severe or pervasive' to create a hostile work environment." *Id.* at 1577. *Gullatte v. West Point Stevens, Inc.*, 100 F. Supp. 2d 1315 (N.D. Ala. 2000) (evidence of three epithets by two different supervisors was insufficiently pervasive to alter plaintiff's work environment in § 1981 hostile work environment case).

Here, Plaintiffs make no allegation that Overcash used a racial epithet or racially derogatory term directed at their Hispanic origin. Rather, these plaintiffs complain that Overcash yelled at them when they made mistakes and would sometimes combine their national origin with a curse word. Plaintiffs are apparently upset that Overcash did not use their names when he cursed at them but instead described them by their national origin. Plaintiffs cannot seriously contend that a hostile work environment is created simply because they were referred to by their country of origin, which was used merely to identify them, which they themselves repeatedly did in their own depositions, referring to others as "the Mexican" or "the Cuban." If Plaintiffs' apparent theory of discrimination prevailed, then a hostile work environment would be established any time a plaintiff used a descriptive characteristic followed by a curse word instead

of the plaintiff's name.  Thus, if Overcash said that "fucking guy" instead of "fucking Cuban" after Plaintiffs made a mistake at the worksite, Plaintiffs would have had a claim for sex harassment.  A hostile environment is not established simply because an alleged harasser refers to someone by a descriptive characteristic like "that blond guy" "the Mexican" or "the White guy" or simply because a curse word is occasionally used at a blue collar worksite.  Likewise, a hostile work environment could not have been established if Overcash knew Plaintiffs' names and said "fucking Abrahantes, Lluberes and Martinez" on a few occasions in response to them making mistakes at the worksite, without proof that Overcash's conduct affected a term or condition of their employment.  The United States Supreme Court has made clear a hostile work environment is not established simply because of unpleasant or insensitive comments, as there is no general civility code in the workplace.  *Oncale v. Sundowner Offshore Services, Inc.,* 118 S.Ct. 998 (1998).

As the basis of Plaintiffs' hostile work environment claim is that Overcash cursed at Plaintiffs and referred to them by their national origin, their claims fail as a matter of law, as the conduct complained of here is significantly less severe than conduct courts have routinely found does not establish a hostile work environment.  The isolated remarks (which include no race-based epithets) made in response to Plaintiffs mistakes at the worksite, simply do not rise to the level of severe or pervasive, actionable, harassment.

Further, there is no evidence that the one "threatening" incident with Overcash was based on the Lluberes' race.  After Lluberes spilled some asphalt, Lluberes claims that Overcash took the shovel from Lluberes' truck and asked Lluberes to get down from his truck and fight him. (Lluberes at 180-181).  Although Lluberes believed at the time that Overcash asked Lluberes to fight him, Lluberes admits and, plaintiff Martinez (who was a witness) confirms, that Overcash

simply asked Lluberes to get out or his truck to help shovel up the spilt asphalt.  (Lluberes at 171-172, 233; Martinez at 175-176).  Lluberes refused to help shovel up the spilt asphalt because he did like the way Overcash asked him to help and because his insurance does not cover him when he gets out of the truck. (Lluberes at 171-172).  Lluberes never got out of his dump truck, and Overcash shoveled up the asphalt.  (Lluberes at 171-172, Martinez at 129, 175-176).  Although Lluberes apparently claims that Overcash should have asked him nicely to help pick up the asphalt Lluberes spilt or not ask at all,  the Eleventh Circuit has stated:

> [Section 1981] prohibits discrimination; it is not a shield against harsh treatment
> at the work place.  Personal animosity is not the equivalent of [race]
> discrimination and is not proscribed by [§1981].  **The plaintiff cannot turn a
> personal feud into a [race] discrimination case by accusation.**

*McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) **(emphasis added)** (internal quotations omitted), *cert. denied*, 479 U.S. 1034 (1987); *see Casey v. Wal-Mart Stores, Inc.*, 8 F. Supp. 2d 1330, 1339 n. 11 (N.D. Fla. 1998) ("Personality conflicts at work are not equivalent to discrimination or retaliation, even when such conflicts generate antipathy and make an individual's position more difficult").

Further, although Plaintiffs make petty complainants about other conduct by Overcash, there is no evidence whatsoever to suggest that **any of the** incidents occurred **because of** Plaintiffs being Hispanic.  While Plaintiffs complain that Overcash would sometimes send them home early when there were too many trucks at the worksite, they admit that four (4) of the six (6) remaining trucks at the worksite were operated by the Soil Tech Hispanic drivers. (Abrahantes at 138-139).  Moreover, on a number of occasions, Pavex Plant Operator Mike Perez simply reassigned Abrahantes to another crew so that Abrahantes would not have to go home.  (Abrahantes at 86-87).  Additionally, on one occasion, Abrahantes claims he was "discriminated against" when an independent trucking company deducted $600.00 from his

wages after Overcash rejected a load of asphalt plaintiff **Martinez** had hauled in Abrahantes' truck. (Abrahantes at 150-151, 159). Abrahantes does not **know** why Overcash rejected the load and Martinez admits that Overcash rejected the load of **asphalt** because the Paver was broken. (Martinez at 147-148, 159).[13]

The only "evidence" of a casual connection between **these** trivial incidents and race is Plaintiffs' own speculation, suspicion, and conclusory **allegations**. *See Williams v. Publix Warehouse*, 1995 WL 224423 (M.D. Fla. April 6, 1995) *aff'd* 100 F.3d 969 (11th Cir. 1996) ("bare allegations and conclusory statements" are insufficient to state a *prima facie* case of discrimination); *Pugh v. Heinrich*, 695 F. Supp. 533, 543 (**M.D. Fla.** 1988), *aff'd.*, 933 F.2d 1020 (11th Cir 1991) (plaintiff could not establish a *prima facie* **case by** "speculation, conjecture, and unsupported conclusions"). As set forth above, this **conduct also** fails to meet the severe and pervasive standard set forth by the Eleventh Circuit in *Mendoza, supra*.[14]

> **2.    Plaintiffs Were no Longer Required to Make Deliveries to Pavex Worksites when Overcash Was Present After Complaining that They Would Not Work with Him**

Where the hostile environment is created by a **supervisor**, the employer is not liable if

---

[13] Plaintiffs also allege in their Amended Complaint that Overcash **would** unreasonably delay them when they delivered asphalt to Pavex worksites. (Amended Complaint ¶ 111). **However**, Plaintiffs fail to allege how being delayed was discriminatory, as Plaintiffs were paid by the hour by the **independent** trucking companies from whom Plaintiffs took assignments. (Abrahantes at 46; Lluberes at 139; **Martinez at 81**). Thus, Plaintiff would have been paid more the longer they were delayed at a Pavex worksite.

[14] If Plaintiffs attempt to claim that such conduct somehow **constitutes** "disparate treatment" employment discrimination rather than harassment, such theory would likewise **fail**. **First**, of course, these plaintiffs are not employees and such a claim would require a suspension of all logic **under the**se facts. Moreover, to establish disparate treatment, a plaintiff must have suffered a cognizable "**adverse action**." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Plaintiffs cannot establish that **the minor** actions of which they complain amount to an adverse action. The Eleventh Circuit defines 'adverse **employment** actions' as 'ultimate employment decision[s], such as discharge or failure to hire, or other conduct that **alters the** employee's compensation, terms, conditions, or privileges of employment, deprives him or her of **employment** opportunities, or adversely affects his or her status as an employee.'" *Chambers v. Walt Disney World Co.*, **132 F.** Supp. 2d 1356, 1368 fn.13 (M.D. Fla. 2001)(citing *Gupta, supra*). "An employment action ... is not adverse **merely** because the employee dislikes it or disagrees with it." *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. **1996**). It is undisputed that Abrahantes and Lluberes stopped making asphalt deliveries for Pavex and other companies **when** medical problems prevented them

there is no tangible employment action and it took reasonable care to prevent and correct promptly any harassing behavior. *Faragher v. City of Boca Raton,* 118 S. Ct. 2275, 2279 (1998).

In the instant action, Martinez never complained to Pavex about any allegation of harassment. (Martinez at 138). Instead, Martinez complained to Abrahantes (his boss) about the way Overcash was treating Martinez. (Martinez at 138). Plaintiff Abrahantes, in turn, admits that he and a "group of drivers" complained to a independent trucking dispatcher in Tampa (not affiliated with Pavex) regarding Overcash's behavior and after they complained, the dispatcher no longer sent the drivers to Pavex. (Abrahantes at 159-160). Further, after having difficultly working with Overcash and deciding that he would no longer work with him, Lluberes explained the situation to the Plant Superintendent at Pavex. (Lluberes at 80-83). After listening to Lluberes' complaints about Overcash, the Plant Superintendent wrote on Lluberes' ticket that he no longer had to work with Overcash's crew. (Lluberes at 80-83, 87-89). After that, Lluberes and Martinez continued to make deliveries to Pavex worksites, making deliveries to Pavex worksites on at least two separate occasions. (Lluberes at 87, 93-94; Martinez at 153).

Once Plaintiffs complained about Overcash's alleged disrespectful treatment, Plaintiffs were no longer required to deal with Overcash. Plaintiffs continued to make deliveries to Pavex and other companies' worksites without incident until medical problems forced Abrahantes and Lluberes to stop driving and Martinez left the area to work the sugar cane harvest (Abrahantes at 28, 161-164; Lluberes at 12, 17, 87, 93-94, 133; Martinez at 153). Thus, this Court should grant Pavex summary judgment as to Plaintiffs' claim for hostile work environment, as Plaintiffs cannot establish a basis for liability.

---

from continuing to drive, and Lluberes stopped making asphalt deliveries when he left the area. *Supra* note 9.

## IV.     Conclusion

For all of the foregoing reasons, Defendant Pavex, Inc., respectfully requests that this court enter an order dismissing with prejudice the asphalt driver plaintiffs Luis Abrahantes, Alejandro Lluberes and Luis Martinez , and award to Pavex its costs of action and such other relief as this court deems proper.

Respectfully submitted,

By: _Tracey Jaensl_____
Tracey K. Jaensch (Fla. Bar No. 907057)

FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL 33602-5133
(813) 261-7800

Attorneys for Defendant Pavex Corporation, Inc.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing Defendant's Memorandum of Law in Support of its Motion to Dismiss Plaintiffs L. Abrahantes, A. Lluberes and F. Martinez for Lack of Subject Matter Jurisdiction Under 42 U.S.C. §1981, or, In The Alternative, Motion for Summary Judgment was served to the following via U.S. Mail, on the 29th day of July, 2002:

Peter F. Helwig                         Jack Scarola
Harris & Helwig, P.A.                   Searcy, Denney, Scarola, Barnhardt &
6700 South Florida Avenue               Shipley, P.A.
Suite 31                                2139 Palm Beach Lakes Boulevard
Lakeland, Florida  33813                West Palm Beach, Florida  33402

_Tracey Jaensl_____
Tracey K. Jaensch