UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MIGUEL PEREZ, et al.,

Plaintiff,

v.

PAVEX CORPORATION, a Florida corporation,

Defendant.

Case No. 8:01-CV-0069-T-27 MSS

**DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFF MIGUEL PEREZ AND MEMORANDUM IN SUPPORT**

## I.      MOTION AND INTRODUCTION

Plaintiff Miguel Perez ("Perez") is a former employee of Pavex employed in the Plant. Unlike all of the remaining plaintiffs in this case (all of whom are black), Perez is Hispanic, and brings his claims based on his national origin and/or ethnicity.

Pursuant to Fed. R. Civ. P. 56, Defendant Pavex Corporation ("Pavex") moves for summary judgment on all of Perez' claims: (1) failure to contract on the same terms as whites for allegedly "placing him in truck driver position rather than mechanic position" at hire, and "later removing his supervisory authority and his company-provided vehicle;" (2) hostile environment; (3) discriminatory discharge; (4) retaliatory discharge (all under Title VII and 42 U.S.C. § 1981) and (5) intentional infliction of emotional distress ("IIED").[1] (R212 at 2-3, citing Second Amended Complaint at ¶¶ 11-25, 28, 30-32, 34-39, 66-69, 167-69, 171-74)

---

[1] Like recognized in this Court's Order Granting Pavex' Renewed Motion for Summary Judgment as to State Tort Claims of Plaintiff Patricia Ford, "[t]he conduct complained of by [Perez, *supra*], including the use of racial slurs, imposing different . . . job responsibilities . . ., does not meet the high standard imposed by Florida courts for [IIED] claims," and Perez admits he has never needed to seek nor sought psychological help. (R162 Perez 435:15-25; 436:1-11)  For the same reasons relied upon in Pavex'

## II.   UNDISPUTED MATERIAL FACTS AS TO PEREZ

1.      **Perez Applies for a Shop Mechanic Position But Does Not Have His Own Tools as Required:**  Perez first applied to work as a shop mechanic at Pavex after Kenny Buchanan, then Pavex' Quality Control/Plant Operator, with whom Perez had previously worked, encouraged Perez to submit an application (R161 Perez 28:24-25; 29:1-4; 42:23-25; 44:12-15). Although he had no openings for mechanics in the Shop, Shop Foreman Mike Mooney interviewed Perez because Mooney is always looking for good mechanics[2] (R281 Mooney 140:7-12; 143:17-19; 145:13-17; R161 Perez 46:8-13). Mooney did not hire Perez as a shop mechanic, however, because Perez did not own his own tools--a requirement for that job (R281 Mooney 140:15-24; 141:8-20; R145 Buchanan 58:16-25; 59:1-8). Mooney told Perez that a better position was open in the Plant and that Perez could later transfer to the Shop if he got tools (R281 Mooney 140:24-25; 141:1-7). Mooney has never hired a shop mechanic who did not own his own hand tools (R281 Mooney 142:6-9).

2.      **Pavex Hires Perez as a Driver:**  Almost two weeks later, Perez' friend, Buchanan, filled out a second application for Perez for a driver position at Pavex, and Perez interviewed with Plant Superintendent Frank Andre (R161 Perez 49:20-22; 52:7-21). Andre hired Perez on August 11, 1999 as a Dump Truck Driver making $8.50 per hour (R161 Perez 53:3-21; R96-Index:12).

---

Renewed Motion for Summary Judgment As To Willie Bates (R279), Pavex is entitled to summary judgment on Perez's IIED claim and will not further address it here as the settled law has been cited numerous times in this case in connection with all of Pavex' other motions.

[2]  When Buchanan introduced Perez to Mooney, Buchanan told Mooney that Mooney would like Perez because Perez was a "Cuban redneck" (R161 Perez 46:18-25). Perez explains that his former co-workers at the Miami airport, including Buchanan (his friend), called him a "Cuban redneck" because Perez dipped tobacco and was "always hunting and stuff like that" (R161 Perez 46:21-25; 47:1-2; R145 Buchanan 57:23-25; 58:1-4).

3.     **After Working as a Dump Truck Driver for a Week, Plant Manager Andre Offers Perez a Position as Plant Groundsman** (R161 Perez 56:8-19). Perez admits Andre offered him the position because the then groundsman, Kenny Kell, was not mechanically inclined and Andre needed someone with mechanical experience (R161 Perez 63:9-20). Andre told Perez that the Plant groundsman position was one from which Perez could move up the ladder at Pavex. (*Id).* Other than in his first week of employment with Pavex, Perez worked exclusively at the Bartow Plant where Pavex makes asphalt (R161 Perez 56:8-12).[3]

4.     **Andre Promotes Perez to Plant Operator:**   After a Non-Hispanic Plant Operator left Pavex, Plant Superintendent Andre ran the Plant himself for a short period and then promoted Kenny Kell, who had been at Pavex longer than Perez, to the Plant Operator position (R161 Perez 62:11-24; 64:2-13, 19-25; 65:1-24). Andre trained Kell for two (2) weeks, and then told Perez that he would give Perez a try as Plant Operator (R161 Perez 64:19-22; 65:17-25; 66:1-6). After training Perez for a week as Plant Operator, Andre promoted Perez over Kell to Plant Operator and demoted Kell back to his previous groundsman position (R161 Perez 65:20-25; 66:1-6).

5.     Along with the promotion to Plant Operator (only a month after Pavex hired him), Andre gave Perez a $1.00 raise to $9.50 per hour, which was approved by Area Manager Jimmy

---

[3]   Perez admits that he spent no time on jobsites with any of the paving crews (where all of the other remaining Plaintiffs in this case worked), except when Perez delivered asphalt during the first week of his employment, and observed no discriminatory conduct by crew foreman Terry Overcash toward crew members (R161 Perez 19:24-25; 20:1-4; 289:9-17). Perez does claim that when he first made a delivery to an offsite paving crew, he did not know what he was doing and backed his dump truck into wet asphalt, tearing the asphalt.(R161 Perez 17:20-25; 18:1-14) Because the asphalt had to be re-laid, Overcash yelled at him for sitting in his dump truck in the shade talking to his " fucking Cuban buddies" while Overcash worked in the hot sun (R161 Perez 18:16-25; 19:1). Once Perez explained that he was new and apologized for tearing the asphalt, "everything backed down" and Perez admits he never had a problem with Overcash again (R161 Perez 19:2-23; 159:1-6).

Allen (R161 Perez 67:3-11, 19-25).  Perez admits Andre never discriminated against him (R161 Perez 79:17-24).

6.      In late October 1999, Allen terminated Andre (R161 Perez 97:1-20; 98:1-3). Andre testifies that, although Perez was learning to be a good Plant Operator, Perez was not qualified to take Andre's place as Plant Superintendent (R142 Andre 166:24-25; 167:1-10). After Andre left, Quality Control Technician Buchanan took over Andre's position and became Perez' supervisor (R161 Perez 97:21-24) because Buchanan also had prior experience as the Plant Operator (R145 Buchanan 29:10-16; 30:5-8).  A month later, however, Buchanan left Pavex because he wanted a raise, which Pavex would not approve (R161 Perez 98:8-19).

7.      Perez alleges that after Buchanan left Pavex in November 1999, Area Manager Allen gave Perez the keys to the Plant truck, told Perez that he'd be the next Plant Superintendent, and that he would work on getting Perez more money (R161 Perez  98:20-25; 99:1; R155 Kesling 45:18-23).  However, after Andre and then Buchanan left, the Bartow Plant Superintendent position was not filled (R161 Perez 179:12-25; 180:1-3; 186:21-24; R162 Perez 379:6-10).   The Plant Superintendent duties were split with Perez given only the new responsibility of keeping track of Plant employees' time, and the remaining duties Andre had performed assigned to various individuals in other positions, including Ted Garcia (Hispanic), who was being trained in Quality Control, and Dispatcher Faye Turner, who became responsible for scheduling asphalt deliveries (R161 Perez 71:19-25; 72:1-3; 178:20-25; 179:1-3; 180:7-25; 181:1-25; R141 Allen 86:18-20; 88:3-19; R155 Kesling 79:11-21).

8.      **Perez Threatens to Walk Off the Job if Pavex Does Not Give Him Another Raise a Month After Pavex Gave Him a Raise:**  On December 6, 1999, a little more than a month after Perez received a $1.00 raise, and right in the middle of making asphalt, Perez called

Grading Division Manager Donald Kesling and told him he had another job offer waiting and threatened to walk off the job if Kesling did not immediately get Perez another raise, leaving no one to operate the Plant (R161 Perez 102:4-21; 184:8-25; 185:1-16; R162 Perez 360:19-25; 361:1-7; R155 Kesling 146:8-18).   Because Area Manager Allen was on vacation, Kesling, who was not Perez' supervisor, was forced to immediately track down and seek approval for the raise from President of Pavex Northern Division Glen Monek in Orlando who, in turn, had to then contact and receive approval from Pavex President John Chelgrin in Pompano to give Perez an immediate $2.00 raise *that day* so that Perez would not walk off the job and shut down the Plant (R161 Perez 183:13-25; 184:1-3; 378:6-9; R155 Kesling 146:8-18).   In connection with his demand, Monek offered to put Perez on salary, which would entail Perez taking on additional responsibilities (R161 Perez 102:18-21).   Perez turned down the offer of salary because he was working " a lot of hours" and at $11.50 per hour, he would make more in overtime if he stayed hourly (R161 Perez 102:22-24; R162 Perez 377:16-19).   Perez admits that Monek told Perez that at that pay, his performance would have to be re-evaluated in ninety (90) days (R161 Perez 102:24-25; 185:17-25; 186:1-12; R162 Perez 377:8-14).

9.    Thus, between November 1999 and December 1999, Pavex was essentially "extorted" by Perez to give him two raises in two (2) months totaling $3.00 (bringing Perez' pay to $11.50 per hour) (R161 Perez 121:12-25; 122:1-2).   Perez concedes that it was very unusual for a Pavex employee to receive such large raises in such a short period of time and he does not know anyone else at Pavex who was treated as well (R161 Perez 122:3-9).

10.    **Orlando Plant Superintendent Mike Reed Becomes Plant Superintendent of Both the Bartow and Orlando Plants and Perez' New Supervisor in January 2000** (R161

Perez 182:14-17; R162 Perez 378:20-23; R164 Reed 16:9-16; R155 Kesling 157:7-12) [4] Contrary to Perez' allegation in the Second Amended Complaint that Reed tried to create "dissention and discord" among Perez and the other Plant employees, when Reed took over the Bartow Plant, Perez admits Reed met with the Bartow Plant employees and told them that when Reed was not around, Perez was the Plant Operator and employees should direct their problems or questions to Perez (R164 Reed 66:2-10; 75:9-13).

11.     **New Supervisor Reed Terminates Perez For Numerous Instances Of Poor Performance --** Four months after taking over Bartow's plant operations, Reed terminated Perez' employment on April 13, 2000, after discussing Perez' performance issues with Northern Division President Monek, who agreed with the termination (R161 Perez 103:24-25; R164 Reed 58:13-15; 78:10-12).   Reed felt Perez lacked the skills and commitment necessary to be an adequate Plant Operator and had numerous performance deficiencies (R164 Reed 58:17-25; 59:1-25; 79:8-24; 80:20-25; 81:19-25; 82:1-7; R96-Index:16).   Indeed, despite ongoing performance problems, Perez had had the audacity in March 2000, to confront Reed, his new

---

[4] To travel between the plants, Pavex Northern Division President Monek assigned Reed the Plant truck Perez had been using to drive to and from work (R162 Perez 415:19-25; 416:1-7; R164 Reed 76:14-25; 77:1). Perez admits that Reed needed a truck to travel back and forth between Bartow and Orlando and that a Plant Operator, like Perez, did not need an assigned truck because Perez was required to remain at the Plant the entire day (R161 Perez 217:13-22; 257:18-21; R162 Perez 416:3-7). Perez nevertheless alleges that a truck not being assigned to the Plant was somehow discrimination against Perez because employees were making fun of him for no longer having a truck (R162 Perez 417:15-25; 418:1-8). However, only salaried supervisors and Quality Control Technicians were assigned trucks to take home; Plant Operators were not given assigned trucks (R157 Monek 131:2-11; Kesling 48:15-22; 49:1-17) Pavex never assigned a truck to an hourly Plant Operator, including prior non-Hispanic Plant operators (R142 Andre 158:19-21).

supervisor, and demand *yet another raise* (R162 Perez 381:3-15).  Perez alleges that Reed told

him that "nobody was getting a raise right now" (R162 Perez 381:16-18).[5]

12.     Perez' termination was based on:

•       Reed was forced to spend more time at the Bartow Plant to fix Plant breakdowns

because Perez was not ensuring performance of Plant maintenance (R164 Reed 70:2-25; 71:1-16,

6-13).  Reed perceived Perez to be blatantly ignoring his maintenance instructions because even

after directly instructing Perez to repair the Plant wet scrubber in February, Perez had still failed

to repair the scrubber by the second week of March, forcing Reed to make the repairs himself

(R164 Reed 58:17-21).  Perez also failed to repair the motor that drives the Plant fan (R151 Glor

143:2-7).

•       A number of managers also had to do repairs because Perez refused to.  In March

2000, Shop Superintendent Mooney complained to Kesling that he was having to maintain the

fan motor in the Plant that was Perez' responsibility (R162 Perez 348:6-7; R155 Kesling 166:9-

25; 167:1-15; R281 Mooney 149:17-25; 150:1-9)).

•       On another occasion, after being instructed to come in on a Saturday for repair

work, Perez failed to show up at the Plant, forcing Reed to make the repairs without Perez (R155

Kesling 168:16-24).  Perez told Dispatcher Turner that he was upset with Pavex because he had

not received a third raise and told Turner that he was not going to do anything extra (R168

Turner 74:1-11).

---

[5]  Although Perez apparently believes that Pavex should also have paid for him to become certified for
quality control, Pavex did not even pay for his boss Mike Reed (White) to become certified for quality
control (R164 Reed 50:24-25; 51:1).

- Dispatcher Turner received numerous calls from the paving crews complaining that the asphalt still had not arrived at the jobsite by the scheduled time (R161 Perez 211:1-22; R168 Turner 71:4-21). Grading Division Manager Kesling also complained to Reed that Perez' asphalt delays were increasing job costs for Pavex' paving operations (R155 Kesling 194:20-25; 195:1-23). Dispatcher Turner, Reed, and Kesling all attribute these delays to Perez arriving late to work (R165 Turner 71:4-21; R155 Kesling 194:25; 195:1-15; R151 Glor 140:17-25; 141:1-2).

- Even when Reed expressly asked Perez to stay and run the Plant, Perez often left early to take care of personal business and took numerous personal calls (R164 Reed 59:17-22), and Reed counseled him about this (R164 Reed 64:10-22).

- Perez' daily Plant reports had to be redone every day by hand because they contained inaccurate information inputted by Perez (R155 Kesling 152:5-22; R168 Turner 68:13-25; 69:1-11). In fact, Turner often could not even read the reports Perez turned in to her (R168 Turner 67:11-14).

- In addition to his other shortcomings, Reed suspected Perez was falsifying his time records because his time records did not match Perez' observed arrival time by Kesling as reported to Reed (R164 Reed 45:14-25; 46:1-4).

13.   **Perez' Replacement Also Fired For Poor Performance.**  After Reed terminated Perez, Reed promoted Kell to the Plant Operator position because Reed was not aware of any past performance issues with Kell at the time (R164 Reed 41:19-21; 93:7-18). However, Reed soon observed that Kell had a bad temper and no ability to run the Plant shortly after he promoted him and told Kell that he needed to find other work because his employment was about to be terminated, which Kell promptly did (R164 Reed 94:3-25; 95:1-25 ).

14.     **Alleged Harassing Conduct --** Perez alleges that a group of Pavex drivers, including Charlie Fanz, Ray Darling, Joe Denoncourt, Kathy Loy, Angie Thornton, Tom Walker, and Paving Superintendent Tom Glor, who had been waiting for Perez to belatedly arrive at work to load the trucks with asphalt, would sit around the coffee machine in the morning and make "smart comments" once he came into work (R161 Perez 114:21-25; 115:1-3).

15.     Perez also claims Dump Truck Driver Fanz, who was *subordinate* to Perez, called Perez a "fucking Cuban," "spic," told Perez he was not qualified to run the Plant, and would say "get the fuck out of here" because Fanz wanted to be the Plant Operator  (R161 Perez 82:25; 83:1-13).  Perez alleges that Fanz' comments to Perez worsened in late November 1999 after Allen told Perez he was going to be the next Plant Superintendent because Fanz could not stand to have someone in charge who was not white (R161 Perez 198:3-25; 199:1-12).  Fanz joked with another employee that there was "one Cuban down and one to go," after an Hispanic employee was terminated because he failed a drug test (R161 Perez 86:8-14).

16.     Perez alleges that Fanz told his daughter Cathy Fanz, who also worked at Pavex, not to eat a pizza that Perez bought for a group of employees who were working in the Plant on a Saturday because he was not going to have her eat a pizza with a "bunch of damn Cubans and fucking niggers" (R161 Perez 246:22-25; 247:4-25; 248:1-6).  Perez just ignored Fanz and let Fanz' daughter get sandwiches (R161 Perez 248:4-6).

17.     In December 1999, Perez alleges that he complained to Jimmy Allen regarding Fanz' comments (R161 Perez 195:23-25; 196:1-3; 199:13-19).  Allen told him that he would talk to Fanz and would keep Fanz away from the Plant (R161 Perez 199:20-23).  A month later, Perez complained to Kesling about Fanz because Allen had left Pavex (R161 Perez 200:5-9).  Perez also alleges that he complained to Reed the same month about Fanz saying "fucking

Cuban" (R162 Perez 387:11-25; 388:1-2).  Perez concedes that after he complained to Kesling, Fanz stopped making comments to Perez and avoided Perez for around two (2) weeks (R161 Perez 200:10-25; 201:1-6).

18.     When Allen and Kesling "got on [Fanz]" because of Perez' complaints about Fanz, Perez thinks Fanz did something to his paperwork because it would disappear from the Dispatch office (R161 Perez 256:3-14).

19.     After staying away from the Plant for a couple of weeks, Fanz "got into it" with a paving crew member Emmanuel Walker (R161 Perez 201:10-18).  Perez alleges that Fanz called Walker a "fucking nigger and a "fucking baboon" (R161 Perez 83:17-20).  Perez alleges that he told Fanz to shut his mouth and "get the hell out of here" and Fanz left the Plant (R161 Perez 202:13-23).  Perez told Kesling that Fanz should not have treated Walker the way he did, and Kesling told Perez that he would keep Fanz out of the Plant (R161 Perez 83:21-25;  203:7-10).  Perez also alleges he overheard Shop Foreman Mooney once comment to another supervisor in November or December 1999 that "you can't give anything to niggers.  They belong in cages" (R161 Perez 251:15-25; 252:1-4).  Perez admits that Mooney's comment was not directed at him and he did not complain about it (R161 Perez 251:21-25; 254:13-15, 19-22; 257:1-6).

20.     After Perez and several other employees complained to Kesling about Fanz again in January 2000 after Fanz had informed the police during an investigation of a break-in at Pavex that the reason for the break-in was "all these fucking niggers and Cubans, there's too many here" (R161 Perez 205:1-15), Kesling suspended Fanz for the day and issued Fanz a written warning (R155 Kesling 78:9-12; 83:8-25; 84:1-20; R96-Index:14).  Kesling told Fanz that Pavex would not tolerate Fanz' behavior and warned Fanz that he must stop using derogatory language directed at minorities (R155 Kesling 78:3-7; R96-Index:14).

## III.    MEMORANDUM OF LAW

### A.    SUMMARY JUDGMENT WARRANTED ON DISCHARGE CLAIM

Because he has neither direct nor statistical evidence of discrimination, Perez must establish a *prima facie* case by using circumstantial evidence.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir. 1990).  To establish a prima facie of discriminatory discharge, Perez must show (1) he is in a protected class; (2) he was qualified for the job from which he was fired; and (3) the misconduct for which he was fired was "nearly identical" to that engaged in by employees outside the protected class whom the employer retained, *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984), or, alternatively, instead of the third prong, that the employer filled his position with someone outside of the protected class.  *See Hawkins v. CECO Corp.*, 883 F.2d 977 (11th Cir. 1989), *cert. denied*, 495 U.S. 935 (1990)

Although Perez was replaced by someone outside his protected class, he cannot prove that he was qualified for the job from which he was terminated due to his numerous performance deficiencies. *See, e.g., Gomez v. Pellicone,* 986 F.Supp. 220, 227 (S.D.N.Y.1997) (plaintiff's chronic tardiness alone defeated her *prima facie* case);  *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 466 (1st Cir. 1996) (explaining that "the 'qualified' prong of the employee's *prima facie* case consists of proof that the employee was adequately performing the job in question"); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178 (7th Cir. 1997) (summary judgment for employer affirmed where plaintiff failed to establish that he was meeting his employer's legitimate expectations).

Perez further cannot point to any similarly-situated individual who was treated more favorably that he was.  Perez concedes that Reed was also investigating Quality Control Technician Chris Smith's (non-Hispanic) telephone use for personal calls (R161 Perez 258:7-8; 20-23).  Indeed Reed told Perez' non-Hispanic successor that he was going to be fired for similar

11

poor performance shortly after Kell was also promoted to Plant Operator.  Reed did not give Kell (who had been working at Pavex longer than Perez) the numerous opportunities to improve that he gave Perez, and as such, Kell actually was treated less favorably than Perez.

Nevertheless, even assuming that Perez has met his *prima facie* burden, he cannot overcome Pavex' numerous legitimate non-discriminatory reasons for terminating Perez to establish that they were a pretext for national origin discrimination or retaliation, particularly where such deficiencies clearly would have motivated a reasonable employer to terminate him and Perez admits the majority of them.

Here, Reed terminated Perez because Perez (1) failed to ensure performance of maintenance of the Plant, (2) failed to make requested repairs, (3) was often tardy or left early, (3) caused complaints by other employees about his numerous personal phone calls, (4) failed to correct his performance despite counseling, and (5) did not follow instructions, leading Reed to conclude that Perez had an "I don't care attitude" after not receiving yet another demanded but unwarranted raise (R164 Reed 58:17-25; 59:1-25; 60:1-16; 79:1-22; 80:8-12, 20-25; 81:1-4, 19-25; 82:1-7; 83:11-20; 89:8-24; R96-Index:16).  Reed also considered that Perez may have been falsifying his time records when Perez' start and stop times were handwritten on his timecard instead of punched in using the time clock, because he knew when Perez was not there and too many handwritten times did not match up (R164 Reed 89:8-24).  Such reasons are among those commonly recognized as legitimate.  *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Circuit 2002) **(reasoning that poor performance, failure to perform work and tardiness (like here) are legitimate, non-discriminatory reasons for terminating employment)**.

While Pavex' burden of rebuttal in articulating a legitimate, non-discriminatory reason has been characterized by the Eleventh Circuit as "exceedingly light" (*Perryman v. Johnson*

*Products Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)), the evidence in this case clearly demonstrates that Perez' undisputed poor performance effected Pavex' ability to perform its paving jobs in a timely and cost-effective manner, as testified to by numerous unrelated witnesses in this case.

Perez must present more evidence than his own disagreement with the accuracy of Reed's conclusions about Perez' performance deficiencies to establish pretext. Courts have universally held that the only issue in a discrimination case is whether the employer's challenged actions were based on factors prohibited by Title VII, not whether the employer made the best, fairest, or most reasonable decision. Indeed, in *Nix*, the 11th Circuit declared:

> [T]itle VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules … Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.

*Nix*, 738 F.2d at 1187 (citations omitted). Thus, whether Perez' discharge was based on mistaken conclusions is of no importance. Absent evidence of discriminatory motivations, his claims fail.

Perez attempts to establish pretext by (a) relying on unrelated comments by Reed having nothing to do with Perez' termination, (b) claiming Pavex has offered "shifting reasons" for Perez' termination; and (c) that Perez' evaluations before Reed were positive. None of these arguments are sufficient in this case to prevent summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538-43 (11th Cir. 1997) (where, as here, the employer has articulated legitimate, non-discriminatory reasons for its decision, Court held plaintiff must prove that each reason was pretext for discrimination, and reversing trial court's denial of the employer's motion for judgment as a matter of law where, although there was sufficient evidence for the jury to

conclude that two of the three reasons were pretextual, the plaintiff failed to produce sufficient evidence to permit disbelief of the reliance on the third reason).

First, Perez alleges that after Reed became the Superintendent of the Bartow Plant, Reed sometimes told Perez to speak English when Perez was speaking in Spanish to co-workers and called him a "fucking Puerto Rican" when Reed had nothing better to do. (R162 Perez 382:10-19; 385:17-25; 386:1-20). Perez, who is Cuban, felt it was an insult to be called Puerto Rican because Puerto Ricans are "supposed to be stupid" (R162 Perez 383:11-25; 384:1-10). Perez would tell Reed that he was not Puerto Rican, but Cuban (R162 Perez 386:11-14).[6] None of these comments is direct evidence[7] of a biased termination (or even relevant evidence) because they were not made in connection with the termination decision and there is no other evidence establishing that Perez' numerous performance deficiencies were not the real reason for his termination. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228-29 (11th Cir. 2002) (where Eleventh Circuit affirmed summary judgment for defendant and held alleged

---

[6] Perez also alleges that Reed "got into it" with a DOT inspector because the DOT inspector refused to wear a hardhat (R161 Perez 271:16-21). After Reed told the DOT inspector that he would throw him off the property if he did not put on a hardhat, the DOT inspector threatened to shut the Plant down (R161 Perez 271:21-25; 272:1-4). Perez alleges that after talking to the DOT inspector, Reed went back to the Plant and said: "You can't give a nigger a high-ranking job because it goes to his head" (R161 Perez 272:5-9). Contrary to the Second Amended Complaint, Perez admits the comment was about the DOT inspector and was not directed at him (R161 Perez 273:3-7). Perez admits he did not complain to anyone regarding the comment Reed allegedly made about the DOT inspector but opines that Reed is just "a little redneck" (R161 Perez 273:1-2, R162 Perez 434:2).

[7] To be considered direct evidence, a statement must (1) be made by decision maker, (2) specifically related to the challenged employment decision, and (3) reveal blatant discriminatory animus. *Chambers v. Walt Disney World Co.*, 132 F.Supp.2d 1356, 1364 (M.D. Fla. 2001). Direct evidence of discrimination is evidence that, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Board of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate" constitute direct evidence. *See Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (providing example of "direct evidence" as a memorandum stating, "Fire Early -- he is too old.")

remark that "we'll burn his black ass" made by a co-worker who later became plaintiff's supervisor and fired the plaintiff was not direct evidence of discrimination because it was *too indirectly related to the termination decision* and too remote in time, as it had been made well before plaintiff's termination of employment and further was not probative of discrimination in the absence of other evidence).

Perez further claims that since Andre's opinion of him was better than Reed's, Reed's unfavorable opinion is faulty and based on national origin.  However, Perez cannot rely on favorable evaluations from prior supervisors or those he extorted to receive raises before Reed became his supervisor, because evaluations by prior managers are immaterial to the legitimacy of Reed's perceptions of Perez' work when he was terminated.  *See e.g. Rojas*, at 1343  (reasoning: "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."); *Blahut v. W.W. Grainger, Inc.,* 1993 WL 454359 *9 (D. Md. October 4, 1993) (reasoning: "Even were it to assume that [plaintiff's] performance under [the prior supervisor] was satisfactory, for purposes of resolving his [discrimination] claim, the Court must measure whether [plaintiff's] performance met with [his supervisors'] expectations at the time of discharge.")(citation omitted) *aff'd*, 36 F.3d 1091 (4th Cir. 1994).

Perez lastly claims that because his termination paperwork indicated he "was verbally warned about coming in late and leaving early.  Did not make sure daily maintenance was performed.  Did not follow instructions" as the reasons for his termination, Reed's elaborations on those reasons in deposition somehow shows the reasons are false.  This is a perplexing tactic as Reed's reasons on the form and those to which Reed and others testified are virtually identical.  *See Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318 (11th Cir. 1998) (summary

judgment for the employer was affirmed where the employer initially misstated the plaintiff was the least qualified of 4 "moldmakers" (viewed as a minimal discrepancy insufficient to show pretext) and later offered allegedly shifting reasons which were reviewed as an elaboration insufficient to show pretext); *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (plaintiff failed to show pretext when the employer's later statements merely offered more detail regarding perceived performance problems).

Moreover, **Perez admits virtually all of the performance deficiencies for which he was fired.** Perez admits that despite receiving a week of training on the old computer, and an additional two hours of training on the new computer, Perez was constantly on the telephone with Pavex' computer trainer asking him questions about the computer and had "difficulty" preparing the daily Plant reports (R161 Perez 220:2-8; 221:1-13; 319:7-22; 349:3-16; R162 Perez 408:8-19). Perez admits that, after he charged the wrong customers for asphalt two separate times (January 4 and February 7, 2000), Kesling complained to Reed and Perez that he had to correct Perez' mistakes (R161 Perez 221:17-25; 222:1-2; R162 Perez 408:15-19; R164 Reed 82:2-7; R96-Index:17). Perez himself admits that co-plaintiff Susan McKenna, the payroll clerk with whom Perez was having an affair, called him all the time because of inaccurate Plant reports he produced (R161 Perez 10:10-25; 11:1; 219:12-22). Although he maintains that Groundsman Kenny Kell could not competently run the Plant, Perez admits he put Kell in charge of opening the Plant early and getting it running so that Perez would have to show up only thirty (30) minutes before he had to load the asphalt into the dump trucks (R161 Perez 166:13-25; 167:1-9; 210:8-25; 211:1-25; 212:1-10; R162 Perez 403:1-25; 404:1-16). Perez claims both that (a) Kell did not know how to properly run the Plaint and (b) despite that, Perez relied on Kell to check all the oils, start the equipment, and sign tickets for the outside dump truck drivers so that

the only task Perez had to do when he came to work late was to light the torch to cook the asphalt because Kell already had everything warmed up and running (R161 Perez 125:1-7; 126:3-9; 210:8-25; 211:23-24; 212:1-10; R162 Perez 403:19-25; 404:1-9). Perez claims he'd simply call Dispatcher Turner, to see if "everything was ready to go" and then would arrive at work after Kell had already got the Plant ready to start (R161 Perez 139:6-20; 140:3-8; R162 Perez 404:6-25; 405:1-6; R168 Turner 72:2-25; 73:1-13). Because Perez allowed Kell to come in early to get everything "warmed up" so Perez could arrive late and flip a switch, Grading Division Manager Kesling, who was not Perez' supervisor, had to start arriving at work at 6:00 a.m. to coordinate asphalt loading for the drivers to ensure that the asphalt was loaded in a timely manner, as delays were occurring, particularly on days that asphalt needed to go out early (R155 Kesling 148:13-25; 149:1-15; 160:20-25; 161:1-3; R151 Glor 140:19-23; 141:13-21). When asphalt needed to be out to the crews at 7:00 or 7:30 a.m., Paving Superintendent Glor testifies that the crews would "be lucky" to have the asphalt between 8:00 and 9:00 a.m. (R151 Glor 140:19-23). Perez admits that it was ultimately his responsibility to start and operate the Plant so that it would produce asphalt in a timely fashion (R161 Perez 210:14-16; 211:1-9; R162 Perez 403:12-24; 404:3-9; R164 Reed 75:9-13).

Perez also admits that sometimes he would just decide not to clock into work in the morning (R161 Perez 212:11-14). Instead, Susan McKenna, the payroll clerk with whom Perez was having an affair, would call Perez to ask him when he arrived at work and write down the time on his timecard for him (R161 Perez 10:10-19; 212:17-23). Perez speculates that there were other employees who did not clock in as required in the morning, but cannot identify any (R161 Perez 213:2-7). Perez also admits he took lots of personal calls at work from home from

his lover McKenna because she needed him to translate conversations with his mother.  (R161 Perez 257:23-25; 258:1-6).

Thus, Perez has presented no material evidence that his termination was because he is Hispanic and not because of poor performance given (a) the numerous undisputed instances of poor performance testified to by numerous witnesses; (b) Reed's similar treatment of Perez' non-Hispanic replacement and (c) Perez' admissions that he engaged in many of the deficiencies that formed the basis for his termination.  Thus, Perez cannot demonstrate that the reasons proffered by Pavex for terminating him are a pretext and his discharge claim should not survive summary judgment. [8]

### B.    PEREZ CANNOT MEET THE HIGH STANDARD FOR A CLAIM OF HOSTILE ENVIRONMENT

Perez also cannot establish that he was subjected to a hostile work environment based on sporadic name calling by a subordinate employee and his supervisor calling him "stupid Puerto

---

[8] Perez' retaliatory discharge claim fails for the same reasons as his discriminatory discharge claim, as he cannot prove a causal relationship between any of his alleged complaints about co-worker Charlie Fanz and his termination and, as shown *supra,* cannot rebut Pavex' legitimate, non-retaliatory reason for his termination. *Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir. 1999). "It does not follow . . . that every time a person engages in . . . protected activity within a short time prior to an adverse employment decision that an inference may reasonably be drawn that they were related." *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 745 (11th Cir. 1996); *cf. Zerby v. Neuromuscular Med. Ctrs. of Fla.,* 1999 U.S. District LEXIS 21255 at *9 (M.D. Fla. 1999) (noting that "[c]oincidence does not establish pretext."). Here, of course, Perez' employment was not terminated within a "short period of time" after he complained about Fanz, as he alleges that he complained about Fanz in January or February and his employment was not terminated until April 13, 2000. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)(in order to establish a *prima facie* case of retaliation, the temporal proximity between an employer's knowledge of protected activity and an adverse employment action must be "very close," and suggesting that three (3) months is too short); *Pritchett v. Imperial Metal & Chemical Co.,* 1997 WL 570929 (E.D. Pa. Sept. 8, 1997) (two months between the date on which employer was notified of plaintiff's complaint and any adverse action insufficient to establish causation), *aff'd,* 156 F.3d 1225 (3d Cir. 1998). Moreover, Fanz was disciplined after Perez' complaints and Perez has proffered no evidence that Reed was somehow retaliating against Perez because Perez complained about a subordinate who Reed barely knew, having worked previously exclusively in Orlando.

Rican" as the slurs about his Hispanic origin are not so "commonplace, overt and denigrating that they create an atmosphere charged with racial hostility," as required to establish an actionable environment in this Circuit. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995).

Perez cannot establish that the alleged conduct was sufficiently severe or pervasive or that it altered the conditions of his employment, creating an abusive working environment. Contrary to Perez' allegations, the "'mere utterance of an ... epithet which engenders offensive feelings in an employee' ... does not sufficiently affect the conditions of employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). Actionable conduct does not consist of isolated instances; it must **permeate** the workplace. *See Harris*, 510 U.S. at 21. In fact, the United States Supreme Court has stated that "[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark County Sch. Dist.*, 532 U.S. at 271 citing *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998). Indeed, where the alleged harassment, even if derogatory in nature, is infrequent and at irregular intervals, it is not severe or pervasive enough to create an objectively hostile or abusive work environment **as a matter of law**. *Harris*, 510 U.S. at 21.

Moreover, as the Eleventh Circuit has stated: "The plaintiff cannot turn a personal feud into a [national origin] discrimination case by accusation." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986); *Casey v. Wal-Mart Stores, Inc.*, 8 F.Supp.2d 1330, 1339 n. 11 (N.D. Fla. 1998) (reasoning: "Personality conflicts at work are not equivalent to discrimination . . . , even when such conflicts generate antipathy and make an individual's position more difficult") *aff'd*, 190 F.3d 541 (11th Cir. 1999). Perez' allegations consist almost entirely of a subordinate, Fanz,

calling Perez names which later stopped after Fanz was disciplined after Perez complained.   The

only other comments toward Perez consist of Reed jokingly calling Perez a "fucking Puerto

Rican" when he knew Perez was Cuban.[9]   None of these allegations, individually or collectively,

rise to even the level of cases which the Eleventh Circuit recognized *en banc* in *Mendoza v.*

*Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) as **not** meeting the standards for severe or

pervasive.   Indeed, in a case alleging national origin harassment like here, the court held that the

alleged harassment by a supervisor was not severe enough to create a hostile environment.   In

*Citroner v. Progressive Casualty Ins. Co.*, 208 F.Supp.2d 328, 340 (E.D. N.Y. 2002), the

plaintiff alleged that his supervisor engaged in the following conduct:

> [Plaintiff's supervisor] mocked the Spanish language; left a Speedy Gonzalez doll
> on plaintiff's desk and referred to plaintiff as Speedy Gonzalez; told plaintiff
> either once or several times (plaintiff's testimony is inconsistent) to act more
> white and loose his cocky Spanish attitude; and passed gas one time near his face
> and made a comment about Hispanics and beans.   Plaintiff also states that [the
> defendant's office manager] told him to act more white on two occasions.
> Finally, plaintiff claims that [the defendant's office manager] referred to him as a
> "spic" on one occasion, and that [plaintiff's supervisor] used the same term on an
> unstated number of occasions.

Despite these claims, the court granted the defendant's motion for summary judgment and stated

that (like here), "a reasonable jury could not conclude that there was one incident that was

extraordinarily severe or that this 'series of incidents was sufficiently continuous and concerted

to have altered the conditions of [plaintiff's] working environment.'"   *Id.* (citing and quoting

*Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2nd Cir. 2000)).

   WHEREFORE,  Pavex request summary judgment as to all of Perez' claims.

---

[9]  As this Court recognized in the Order Granting Pavex' Renewed Motion for Summary Judgment as to
Claims of Plaintiff Joseph Hickman, Perez cannot maintain a hostile work environment claim based on
allegedly overhearing racially derogatory comments about blacks, as those comments were not directed at
Perez, who is not black.

Respectfully submitted,

By: /s/Tracey K. Jaensch
      Tracey K. Jaensch
      Fla. Bar No. 907057

      FORD & HARRISON LLP
      101 E. Kennedy Boulevard, Suite 900
      Tampa, FL  33602-5133
      (813) 261-7800
      Attorneys for Defendant Pavex Corporation, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mr. Peter F. Helwig
Harris & Helwig, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, FL  33813

Jack Scarola
Searcy, Denney, Scarola,
Barnhardt & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33402

      Tracey K. Jaensch
      Attorney

TAMPA:193996.2