## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MIGUEL PEREZ, *et al,*

        **Plaintiffs**

vs.                                 **No. 8:01-CV-0069-T-27MSS**

PAVEX CORPORATION, a
Florida Corporation,

        **Defendant**

_____/

## PLAINTIFF MIGUEL PEREZ' MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiff MIGUEL PEREZ alleges that Pavex discriminated against him, as part of a pattern or practice of discrimination, in that it refused to hire him as a mechanic, despite his qualifications; subjected him to a hostile work environment; and discharged him, because of his national origin and ethnicity (Cuban). In addition, he alleges retaliation for his opposition to unlawful discrimination, and intentional infliction of emotional distress. Second Amended Complaint ¶¶11-23, 24-39, 167-69, 173 (Dkt. 114); More Definite Statement of Plaintiffs' Claims at 2-3 (Dkt. 212).

Plaintiff Perez (hereinafter, plaintiff) makes his claims not only under the Civil Rights Act of 1866, 42 U.S.C. §1981, but also under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e and the Florida Civil Rights Act of 1992, Florida Statutes, Chapter 760, having filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission which, after investigation, issued a Determination Letter finding that Pavex subjected him to a hostile work environment and discharged him because he is Hispanic, in violation of Title VII. R122-*Index*: 9 at 1.

<u>Statement of Disputed Facts</u>

1. Plaintiff does not dispute that he initially applied for a mechanic job, was recommended by Pavex employee Kenny Buchanan, and that even though there was no specific opening, Mechanic Shop

Foreman Mike Mooney interviewed plaintiff because he is always looking for good mechanics.

Plaintiff had previously worked for six years as a diesel mechanic, at Miami International Airport. Prior to that, plaintiff had worked for about 10½ years as an auto mechanic for Firestone and Intercity Auto Store, and had graduated from a vocational high school, where he received for training as a mechanic. R161 Perez 35:13-21, 36:4-25. 38:21-24, 39:5-14.

In referring plaintiff, Buchanan told Shop Foreman Mooney that he had worked with plaintiff for several years at Miami International Airport, that plaintiff was "a good mechanic," and that plaintiff had his own tools which were at his home in Miami. R145 Buchanan 56:25, 57:1-11, 58:18-22, 59:5-7.

Plaintiff disputes the assertion that Mooney did not hire him because he did not have his own tools. As shown above, plaintiff did own his own tools, and Mooney knew this, because Buchanan had told him so. In rejecting plaintiff, Mooney made no mention of the tools or lack of them, but told plaintiff only that there was a hiring freeze. R161 Perez 31:1-12. Plaintiff asked if there were any openings in other areas, and Mooney told him there were not. R161 Perez 32:7-9. At the time, the salary range for mechanics at Pavex was $10 to $17 per hour. R121-*Index*: 5 at 3.

Three months later, Buchanan recommended another friend to Mooney. This friend, Joe Earls, did not have mechanic experience or tools, but was white. Mooney hired this friend as a truck driver for the shop. R145 Buchanan 77:25, 78:1-10; R121-*Index*: 1 at 5 (indicating Earls' race and date of hire).

2. Not disputed that less than two weeks after he was rejected for the mechanic job, plaintiff was hired by Plant Superintendent Frank Andre as a truck driver at $8.50 per hour.

While making his first delivery of asphalt to a construction job, plaintiff asked some of the contract drivers, who were Cuban, how the delivery process worked. However, while backing up to deliver his load, he damaged some fresh asphalt, and Foreman Terry Overcash jumped up on his truck and exclaimed, "What the fuck do you think you're doing." Plaintiff apologized and explained that he was new, but Overcash berated him for "talking with your fucking Cuban buddies." R161 Perez 17:16-

21, 18:1-24.  As it was his first day of work, plaintiff did not want to get off on the wrong foot, and did not complain about Overcash's behavior.  R161 Perez 19:9-19.

3.  Not disputed that defendant made plaintiff a Plant Groundsman because it needed a person with mechanical experience and the other Groundsman, Kenny Kell, did not have it.

4.  Plaintiff does not dispute that when the white Plant Operator left Pavex, defendant promoted Kell, the white Groundsman, to that position, despite his admitted lack of mechanical experience.  Plaintiff also does not dispute that after Kell failed at the position, defendant did not fire him, but returned him to his Groundsman position, and made plaintiff the Plant Operator.  As before, plaintiff assumed this new position without an increase in pay, and did not receive an increase until he went up the chain of command and obtained one some time later.  R161 Perez 67:3-25, 68:1-5.

5.  Plaintiff admits that Andre put in for plaintiff's raise on October 21, 1999, and that he received a raise to $9.50 / hour on November 1, 2000, but disputes that it was "only a month after Pavex hired him", when it was in fact nearly three months after he was hired on August 11, 1999.  R122-*Index*: 1, 5.   Andre did a written performance evaluation of plaintiff during this time, and rated him "above average," the highest possible rating on the form, in all categories.  R122-*Index*: 1.

6.  Plaintiff admits that after Andre left Pavex in October of 1999, defendant appointed Quality Control Technician Kenny Buchanan to replace Andre as Plant Superintendent, and that Buchanan then became plaintiff's supervisor.  Buchanan testified that he never had any problems with plaintiff or with his performance, and that no one complained to him about plaintiff.  R145 Buchanan 63:22-25, 64:1-6.

7.  Plaintiff does not dispute that after Buchanan left Pavex in November of 1999, the Plant Superintendent position was not filled, and that Area Superintendent Allen gave him a company truck,[1] told him he would be the next Plant Superintendent, and said he would work on getting him a pay

---

[1]When Andre and Buchanan were running the plant together, each had a company pickup truck.  When first Allen and then Buchanan left, Buchanan's truck was assigned to plaintiff.  R162 Perez 415:6-15.

increase. Specifically, Allen stated that if plaintiff performed well, he would put in the papers for the formal promotion to Plant Supervisor "next month." R161 Perez 101:20-25, 102:1-3.

Plaintiff disputes that his only additional duty after Buchanan's departure was the keeping of plant employees' time. In fact, he was placed in charge of the plant, again without a pay increase: he managed the inflow of raw materials (rock aggregate, liquid asphaltic cement or "AC", and sand), signing for deliveries, the manufacture of the asphalt, the loading of the asphalt into trucks, the weighing of the trucks, billings to customers, supervision of four plant employees, and repair and maintenance of the plant. R161 Perez 127:13-25, 128:1-25, 129:1-2, 347:14-25, 348:1-7, 20-24; R162 Perez 410:6-16.

8. Plaintiff admits that when "next month" came around and Allen had not acted on plaintiff's promotion, he went to Grading Manager Don Kesling, who was in charge in Allen's absence on vacation, and stated that he had looked at other options, and did not want to "sit here and wait" any longer. R161 Perez 102:4-15. Plaintiff agrees that defendant offered and he accepted a $2 / hour pay increase, and that defendant was to evaluate him again in 90 days in order to determine whether he would become a salaried Plant Superintendent. R161 Perez 102:16-25, 103:1-2; R122-*Index*: 4.

Plaintiff disputes the assertion that he "extorted" the raise and that if plaintiff had quit there would have been "no one to operate the Plant" and operations would be jeopardized. In fact, Kell was still a plant employee and could have continued to operate the plant until a replacement was found. R161 Perez 184:23-25, 185:1-7. Although Kell did not have the mechanical or management ability that plaintiff had, defendant regarded him highly enough to promote him to replace plaintiff after it fired plaintiff four months later, in April of 2000. Defendant's Memorandum at 8, ¶13.

9. Not disputed that since his date of hire as a truck driver on August 11, 1999, through his promotion to Plant Groundsman, then to Plant Operator, and then to responsibility for running the plant without the formal title of Plant Superintendent in December of 1999, plaintiff received one raise from $8.50 to $9.50, and another from $9.50 to $11.50. During that time, in addition to taking on

substantial new responsibilities, plaintiff received two written performance evaluations, one from Andre and one from Kesling, both giving him the highest possible ratings in all nine categories. R122-*Index*: 1, 4. On the second evaluation, which was the last performance evaluation plaintiff received from Pavex, Kesling made the notation, "Highly skilled plant operator & mechanic." R122-*Index*: 4.

During this time, and throughout his employment at Pavex, plaintiff was subjected to regular and repeated acts of harassment because of his Cuban ancestry, to wit:

- Plaintiff was required to punch a time clock in the trailer where the white Pavex truck drivers gathered for coffee in the morning. The group used racial slurs on a regular basis: "It was like nigger this or fucking Cuban this . . . It was constant." Even Plant Superintendent Andre admitted to plaintiff that "Charlie [Fanz, one of the white drivers] don't like Cubans." Fanz called plaintiff a "fucking Cuban" and a "spic", sometimes in Andre's presence. R161 Perez 80:21-25, 81:1-9, 82:18-25, 83:1-6, 116:7-12. When one Hispanic worker was fired in September of 1999, Fanz said to plaintiff and others, as plaintiff was punching out, "One fucking Cuban down and one to go." R161 Perez 83:6-13, 85:9-14. The harassment at the time clock trailer was regular and "constant", like it "was breakfast. Going to punch in, it was the same thing." R161 Perez 191:22-25, 192:1-9.

- Once Andre and Buchanan had left in November of 1999, and it became clear that plaintiff was in charge of the asphalt plant, the white drivers increased their abuse, stating in no uncertain terms that they resented the fact that plaintiff, whom they referred to as a "fucking Cuban", had been put in charge of the plant. Fanz told others that "We need to get the fucking Cuban out of the tower [plant control booth]." R161 Perez 83:6-13, 99:2-9, 189:15-24. Plaintiff Smith confirmed that the white drivers made it clear that they "didn't think [plaintiff] should have had that plant operator job" because "it's usually white people that run the plant." R166 Smith 190:23-25, 191:1-6. Fanz said to plaintiff, "You fucking Cuban. You fucking spic. Go back to Miami. What the fuck are you doing here?" R161 Perez 191:3-9.

- Fanz also came into the plant and attempted to create discord between plaintiff and the other employees who reported to plaintiff. He would address these employees, including Joe Hickman and Matt Powers, as "Cuban lover" and "fucking Cuban lover" because they got along with plaintiff. R161 Perez 191:10-19. When Fanz and several others were working at the plant on a Saturday to make some overtime, plaintiff bought pizza for the entire crew for lunch. Fanz told his daughter, Kathy, who was also an employee, in front of the entire crew including plaintiff, that she should not eat the pizza "because the fucking Cuban had bought it," and should not be "eating with a bunch of damn Cubans and fucking niggers." R161 Perez 246:19-25, 247:1-25, 148:1-6.

- These slurs continued throughout the remainder of plaintiff's employment, despite plaintiff's complaints to higher management. R161 Perez 199:3-15. Plaintiff complained to Area Superintendent Jimmy Allen in December of 1999 regarding Fanz' slurs. Allen stated that he would talk to Fanz and keep him away from the plant, but Fanz did not alter his behavior. R161 Perez 191:3-9, 199:13-25.

- Plaintiff also complained to Kesling about these slurs.  Kesling stated that he would "take care of it."  After that, Fanz desisted for about a week, at most two weeks, and then resumed his previous behavior, and continued to come into the plant and address employees with racial slurs.  R161 Perez 189:10-14, 190:19-25, 191:1-16, 200:5-13, 201:3-10.  Then Fanz got into an argument with Plaintiff Emmanuel Walker and said to him, in plaintiff's presence, "You fucking nigger. You fucking baboon.  Get the fuck out of here."  Plaintiff ordered Fanz out of the plant and then reported the incident went to Kesling, along with the resumed harassment of himself by Fanz.  Kesling stated that he would keep Fanz out of the plant.  However, nothing changed.  R161 Perez 202:14-25, 203:1-25, 204:1-10.

- Plaintiff made yet another complaint to Kesling on the day that Pavex experienced a burglary, and Fanz told the investigating law enforcement officer, as well as various Pavex employees, "all these fucking niggers and Cubans, there's too many in here.  That's why the place was being broken into all the time."  Plaintiff did not hear Fanz make the statement to the officer, but was present and did hear it when Fanz boasted to other employees that he had made the statement to the officer.  Fanz continued afterward to use racial slurs at Pavex, despite the complaints of plaintiff and others.  R161 Perez 204:10-25, 205:1-19.

- Shop Foreman Mike Mooney and his assistant foreman, Jim Lewis, both white, treated plaintiff with hostility.  The shop was a "white man's world," where there were no African American or Hispanic employees and Mooney and Lewis used racial slurs at will.  Lewis frequently called plaintiff a "spic" and told him to go back where he came from.  R161 Perez 306:5-25, 307:1-5; R145 Buchanan 70:1-3.  A white shop employee, Plaintiff Joe Earls, complained to Mooney about Lewis' use of racial slurs directed against Blacks and Hispanics, but the slurs continued.  R148 Earls 124:20-25, 125:13-25, 126:1-9.

- Plaintiff had to interact with the shop for parts and repairs.  He walked in on a conversation between Mooney and Asphalt Superintendent Glor about a damaged vehicle, and heard Mooney say, "You can't give these niggers anything.  They belong in cages."  R161 Perez 251:15-25, 252:1-10.  Mooney also made racial remarks directly about plaintiff to plaintiff's subordinates, such as, "So how is the Cuban running the plant?"  R153 Hickman 94:19-24.

- During the time when plaintiff was in charge of the plant, several Cuban contract drivers complained to him about harassment by Pavex supervisors, including Asphalt Foreman Overcash, and plaintiff conveyed those complaints to management.  Kesling stated he would "see what we can do," but took no apparent action, and the slurs and threats continued.  R161 Perez 155:12-25156:1-25, 157:1-14, 207:15-25, 208:1-25, 209:1-2.  Overcash testified that Pavex has never warned, disciplined, or even talked to him regarding any complaint of discrimination or harassment by anyone at Pavex.  R159 Overcash 205:24-25, 206:1-8.

10.  Not disputed that Orlando Plant Superintendent Mike Reed became plaintiff's supervisor in January of 2000.  Reed was responsible for both plants, and came to Bartow about 20 times, or about twice a week, from January, 2000 until plaintiff's discharge on April 13, 2000.  In addition, Reed spoke daily with plaintiff via Nextel.  R161 Perez 109:11-25, 110:19-23; R164 Reed 70:2-7, 73:4-11.

When Reed became plaintiff's supervisor, he promptly took away plaintiff's company truck.

R162 Perez 415:6-24.

Reed regularly used racial slurs toward plaintiff and other Hispanics and African Americans:

• Reed repeatedly called plaintiff "fucking Puerto Rican" to his face, "all the time."  He summoned plaintiff with the command, "Hey, fucking Puerto Rican.  Come here.  Get your ass over here."  He questioned plaintiff with the words, "Listen, fucking Puerto Rican, I don't understand what you're saying."  When plaintiff would remind Reed that he was Cuban, not Puerto Rican, Reed would "just laugh, you know, and taunt me."  Reed called plaintiff a "fucking Puerto Rican" many times, more times that plaintiff can count.  R122 Perez 274:25, 275:1-6, 277:6-17; R162 Perez 384 17-25, 386:3-14.

• Reed mocked plaintiff by "acting stupid" and waiving his hands in the air when plaintiff asked him a question, as if to mimic a Hispanic stereotype, and imply that plaintiff was stupid.  When plaintiff attempted to speak to him, he used racial slurs, acted as if plaintiff was talking nonsense by stating, "Huh? huh?" repeatedly, or walking away while plaintiff was speaking.  R161 Perez 274:25; 275:1-3, 24-25; 276:1-8.

• Plaintiff is bilingual and therefore was able to speak Spanish to direct the many monolingual Cuban contract drivers who made deliveries to the plant.  When Reed observed him doing this, he admonished plaintiff to "Speak English.  This is America."  R162 Perez 385:3-13.  In his deposition, Reed denied making this statement to plaintiff, but acknowledged that some of the drivers spoke only Spanish and that it was necessary to give them directions in Spanish.  R164 Reed 55:18-25, 56:1-2, 57:10-25, 58:1-3.

• During an argument with an African American State inspector, Reed walked away in anger, stating to plaintiff, "That fucking nigger.  You can't give a nigger a high-ranking job because it goes to his head.  Look at that motherfucker."  Reed also told plaintiff that a Pavex employee from the Bahamas was a "sand nigger."  R161 Perez 271:16-25, 272:1-11, 273:12-22.

• A white plant employee, Plaintiff Joseph Hickman, confirmed that he heard Plant Manager Reed make derogatory statements about Cubans, and use the terms "wetback" and "nigger", at the Bartow plant.  R153 Hickman 88:3-8.

Plaintiff began to feel that, "the more I complained, the more heat I got."  When he pointed out

to Mike Reed that Reed's discipline of a black employee, Dusty Apton, was more severe than that of

similarly situated white employees, Reed was hostile. R161 Perez 254:2025, 255:1-6, 278:14-25, 279:1-12,

282:12-25, 283:1-8.  Plaintiff complained to Reed about Fanz' continuing harassment, and particularly

about being called a "fucking Cuban." Reed's response was, "Just don't pay no attention to him.  He

ain't nothing."  Reed took no further action on plaintiff's complaint.  R162 Perez 387:11-25, 388:1-18.

After he had complained about Fanz, plaintiff noticed that his "paperwork started disappearing from the office, certain plant reports and stuff like that." He suspected Fanz because of Fanz' racial hostility to plaintiff, and his easy access to the reports, which were routinely placed on Faye Turner's desk in the coffee / time clock trailer. R161 Perez 256:8-20.

11. Plaintiff does not dispute that Reed discharged him on April 13, 2000, but disputes that it was for any legitimate, nondiscriminatory reason. See ¶12, *infra*. Plaintiff also disputes the assertion that he "confronted Reed" in March of 2000 about obtaining a raise. In fact, plaintiff went initially to Kesling in March to inquire about the 90-day evaluation which he and Kesling and Monek had discussed in December. Kesling directed him to Reed. Reed stated there was a wage freeze, so plaintiff would have to wait it out. R161 Perez 102:22-25, 103:1-25. The conversation was initiated by plaintiff and there was no discussion whatsoever of plaintiff's work performance. R162 Perez 381:16-23.

12. Plaintiff disputes each of the reasons asserted by defendant for his discharge.

First bullet: Plaintiff disputes the assertion that Reed had to spend more time at the plant to fix breakdowns because plaintiff was not properly performing plant maintenance. In fact, defendant's own contemporaneous records show that there were *fewer* plant breakdowns during plaintiff's tenure as plant operator, than there were during comparable periods both immediately before and immediately after plaintiff's tenure. R121-*Index*: 3 and 4.[2]

---

[2]The frequency of problems in the plant which had consequences for the paving operations can be tracked through the daily logs of Asphalt Foreman Terry Overcash, whose log of paving operations included notes of problems he encountered, such as problems with the quality of the asphalt he received, or with delays due to plant breakdowns. R121-*Index*: 3 and 4.

Plaintiff was in charge of the Bartow asphalt plant from November 23, 1999 (the day after Buchanan quit) until his discharge on April 13, 2000, a period of 142 days. During that time, Overcash's diary records 9 days (11-23-99, 12-7, 12-8, 12-13, 1-3-00, 1-20, 3-21, 3-24 and 3-31) on which there were problems caused by the plant, such as a plant breakdown, or that the asphalt was otherwise late or of inferior quality. R121-*Index*: 3 and 4. One of those 9 days was November 23, 1999, first day after Buchanan quit, when Overcash records that the crew "didn't get asphalt until 11:30 a.m." R121-*Index*: 3.

During the 142 days following plaintiff's period in charge of the Bartow plant, from April 14, through August 31, 2000, Overcash's log records that the plant had problems on 11 different days (4-17, 4-24, 4-26, 4-27, 4-28, 5-2, 5-4, 5-22, 6-13, 8-10 and 8-30). R121-*Index*: 4. During the 142 days prior to plaintiff's taking charge of the Bartow plant, from July 3 through November 22, 1999, Overcash's log reports

Moreover, defendant alleges that Reed asked plaintiff in February of 2000 to repair a scrubber in the plant, and that as of mid-March, plaintiff had failed to do so.  However, defendant's own records show that there were no plant breakdowns or disruptions which affected paving operations during that period.  R121-*Index*: 4 (no record of any such problems between January 20 and March 21).  With regard to the fan motor, Reed's assertion that plaintiff failed to repair it is incorrect.  The problem arose on a Friday, when plaintiff determined that, although the fan was still operating, the bearings needed to be replaced.  Reed told plaintiff to come to work the following day, a Saturday, to co-ordinate the repairs. Plaintiff stated that Kesling had already agreed that plaintiff would not have to work that weekend, as he needed to make some repairs on his mother's house.  However, when Reed stated that plaintiff had to repair the fan by Monday morning, plaintiff agreed to come in that Saturday, and did so, and worked with others to complete the repairs that day.  R122-*Index*: 11 ¶¶4-5.

Second bullet:  Somewhat redundantly, defendant asserts that Mooney complained to Kesling that plaintiff failed to maintain the fan.  Kesling testified that he recalled Mooney's complaint, that it was the only complaint Mooney made about plaintiff, that plaintiff generally did what he was asked to do, and that he did not neglect the repair of the plant.  R155 Kesling 160:17-25, 161:1-7, 166:1-7.

Third bullet: Again redundantly, defendant asserts that plaintiff failed to show up on a Saturday to repair the plant, citing only to hearsay testimony of Kesling that Mooney complained to him that plaintiff failed to show up.  In the cited testimony, Kesling reiterates that this was "the only time he [Mooney] mentioned to me that he wasn't happy" with plaintiff.  R155 Kesling 168:16:24.  From this context, it is clear that we are again talking about the Saturday when plaintiff had previously arranged to be off work, but that after Reed insisted, plaintiff did show up and participate in the repairs.

Fourth bullet: Kesling did express concern about delays in delivering asphalt to jobs, and

---

that the plant had similar problems on 11 days (8-25, 9-3, 9-9, 9-10, 10-20, 10-25, 10-26, 10-27, 11-4, 11-9 and 11-22).  R121-*Index*: 3.

decided to start coming in himself at 6:00 a.m. to determine whether it was the plant that did not have the asphalt ready, or the delivery drivers who did not report to the plant for loading on time.  R155 Kesling 149:3-8.  Plaintiff told him on many days, the truck drivers would stay in the coffee - time clock trailer, and were not in their trucks, on line and ready to load as they were supposed to be. R162 Perez 401:4-10.  Kesling found that, indeed, the drivers were sometimes sitting around the coffee trailer, and he would have to personally "go over there and get them. . . moving." R155 Kesling 150:11-24, 151:9-11.  Thus he did not reprimand plaintiff for the delays in delivering asphalt.  R155 Kesling 149:3-15.

Turner, the dispatcher, may have assumed plaintiff was late for work, because plaintiff on many days did not arrive until after Kell had arrived first and warmed up the equipment.  Kesling and plaintiff had worked out a plan whereby Kell, who wanted the overtime, would come in first and plaintiff would not need to arrive until it was time to begin running asphalt.  R161 Perez 130:22-25, 133:1-12; R155 Kesling 149:16-24. That arrangement continues in defendant's Orlando operations to this day, whereby the current Plant Operator / QC Kenny Buchanan is not required to arrive early enough to start the plant, but a subordinate, Mark Touponce, is assigned to do that instead.  R145 Buchanan 7:9-14, 41:1-11, 81:3-7.  Moreover, defendant's own records, the Overcash crew paving logs, show that during plaintiff's tenure as plant operator, from November 23, 1999 until his discharge on April 13, 2000, the asphalt arrived on the job late only on his very first day, on November 23, 1999, the day after Buchanan quit without notice.  During a comparable 142-day period immediately following plaintiff's tenure as plant operator, asphalt was late to the paving crew on four occasions. R121-*Index*: 3 and 4.

Fifth bullet:  Plaintiff does not dispute that on rare occasions he had to take time off for personal business, but denies that he ever received counseling about this or about anything else from Reed.  R161 Perez 351:4-20.   Indeed, Kesling who, unlike Reed, was present in Bartow every day, confirms that there were no issues about plaintiff's leaving work early.  R155 Kesling 151:13-17..

Defendant's own payroll records show that plaintiff was anything but balky about putting in

extra hours to keep the plant running.  During his entire 22-week tenure as plant operator, from November 23, 1999 to April 13, 2000, he worked in excess of 40 hours every week except one, when he worked 39.25 hours.  R122-*Index*: 2.  In eleven of those weeks, he worked more than 60 hours.  *Id.* In his last four full weeks, he worked 51.5, 70.5, 68.5 and 59.25 hours, respectively.  *Id.*

Reed never mentioned anything to plaintiff about making or receiving personal phone calls. R161 Perez 351:3-6.  Kesling testified that he was not aware that phone calls were creating any problem with plaintiff's performance, and thus never talked to him about it.  R155 Kesling 151:18-25, 152:1-4.

Sixth bullet:  Plaintiff does not dispute that there were problems with the daily reports; however, as Kesling himself testified, these were attributable "most of the time to problems with the printer," which "wasn't printing on the right lines."  As a result, the paperwork had to be redone almost every morning by hand.  Although the problem did not get resolved during plaintiff's tenure, Kesling testified that he "can't say whose fault it was."  Not until defendant called in its corporate technology person, David Boston, was the problem resolved.  The problem was not straightened out, as best Kesling can recall, until "seven, eight months" before the date of his deposition on May 17, 2002.  Therefore, according to Kesling, the problem with the reports persisted until about October of 2001, eighteen months after plaintiff was fired.   R155 Kesling 152:5-25, 153:1-25, 154:1-5.

Seventh bullet:  Kesling testified that he had no problem with plaintiff's timekeeping, and never believed he was falsifying his time records. R155 Kesling 154:6-13.   Reed testified that he determined plaintiff was falsifying his time records because they had handwritten entries on several occasions, and "[i]t was too much of a habit . . . there is no reason for him not to punch in and out."  R164 Reed 45:22-25, 46:1-9, 89:8-12.  Reed testified that he did not remember whether plaintiff ever told him he avoided the time card trailer some days because of racist comments by people hanging around there, but that he was aware that these comments were made in the time clock trailer.  R164 Reed 89:25, 90:1-8.

In fact, plaintiff was regularly subjected to vicious racial slurs when he went to the time clock -

coffee trailer to punch in.  *Supra* ¶9.  Some days, especially when he saw that there was a crowd in the trailer, he simply could not face them and did not punch in: "I mean, I was just – and sometimes, like, I said, 'Forget it.'"  R161 Perez 195:23-25, 196:1-25, 197:1-14.

Defendant admits that it follows a policy of "progressive discipline," whereby all but the most serious offenses are dealt with through discipline of increasing or progressive seriousness, generally beginning with a verbal warning, followed by a written warning, suspension and ultimately resulting in termination if the problem is not corrected.  R158 Monek (Defendant's Rule 30(b)(6) Designee) 187:9-25, 188:1-5.  Written warnings are placed in the employee's personnel file.  R158 Monek 189:12-14.

Plaintiff was never warned, written up, or disciplined in any way during his employment at Pavex.  R161 Perez 350:16-25, 351:1-20.  The personnel file produced by defendant in discovery contains no record of any warnings or discipline, and defendant has proffered no such record here.

In support of its assertions in this paragraph, defendant relies almost exclusively on the testimony of Reed and Mooney, who were biased against plaintiff because he is Cuban, as demonstrated by their use of racial slurs toward him and other Hispanic employees, and whose testimony is contradicted in many instances by defendant's own records.  No written warnings were given to plaintiff, and the only written record made by defendant of plaintiff's work performance is his two excellent evaluations.  Plaintiff not only disputes the truth of these assertions, but disputes that Reed could have believed they were true, as Reed was himself was involved in some of the incidents, such as the fan motor repair, and regularly discussed plaintiff's performance with Kesling.

13.  Plaintiff does not dispute defendant's assertions that Reed replaced plaintiff by promoting Kell to his position, that Kell had a bad temper was unable to run the plant, and that Reed testified that he told Kell that he needed to find other work because he was about to be discharged.

Specifically, Reed testified that Kell lost his temper a number of times, including but not limited to smashing a window in the control room with his fist, throwing his radio across the counter, and

hitting another window and cracking it.  Reed did not discharge him for these actions, but merely gave him a written warning.  R164 Reed 93:7-9, 94:3-20, 95:5-13.  When Pavex continued to have problems with the operation of the plant, Reed told Kell he should look for another job because he was "close to being terminated." R164 Reed 94:21-25, 95:1-4, 14-20.  Prior to discharging plaintiff, Reed never gave him any written warnings, nor advised him that he was close to being terminated.  R164 Reed 96:14-17.

14.  Not disputed.  Documented at ¶9, *supra*.

15.  Not disputed.  Documented at ¶9, *supra*.

16.  Not disputed.  Documented at ¶9, *supra*.

17.  Not disputed.  Documented at ¶¶9-10, *supra*.

18.  Not disputed.  Documented at ¶9-10, *supra*.

19.  Not disputed.  Documented at ¶9, *supra*.

20.  Not disputed.  Fanz was cited for a number of performance problems during his employment at Pavex, including punching in prior to the start of work (several occasions), verbal abuse causing an employee to quit, interfering with daily operations, abuse of Nextel, creating morale problems, damaging the paving machine by driving a truck into it, arguing with members of the public (two occasions), refusal to accept a work assignment, unsafe driving, and "using inflammatory language toward Cubans and blacks." R122-*Index*: 6 & 7.  Fanz himself admitted that he often used racial slurs at Pavex, referring to African Americans and Hispanics as "nigger", "stupid Cuban" and "fucking Cuban".  R149 Fanz 40:16-25, 41:1-5, 71:1-11.  Area Superintendent Don Kesling was aware of Fanz' use of racial slurs, and talked to Fanz about it " a few times." R`49 Fanz 41:2-16.  Finally, Fanz was written up for using racial slurs, and when he did not call or show up for work the next day, was suspended for one day.  R122-*Index*: 6. After Fanz had been twice written up and suspended, he continued to use racial slurs toward plaintiff and others.  R161 Perez 199:7-12.  After Mike Reed took charge of the plant in January of 2000, plaintiff complained to Reed about Fanz' continuing harassment,

but Reed took no action.  *Supra* ¶10.  Fanz continued as an employee in good standing until he voluntarily resigned on January 10, 2001.  R122-*Index*: 8.

I  Discriminatory Discharge

A.  Disparate Treatment Analysis

As defendant correctly states, a plaintiff may establish a prima facie case of discriminatory discharge through circumstantial evidence that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he was discharged, and (4) he was replaced by a person outside his protected class.  Defendant's Motion at 11 ; Chapman v. A-1 Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).  Defendant admits that plaintiff has satisfied elements 1, 3 and 4, but argues that plaintiff lacks evidence that he was qualified to perform his job.  Defendant's Motion at 11.  However, the qualifications prong of the prima facie case is of limited applicability in discharge cases.  Damon v. Fleming Supermarkets of Florida, 196 F.3d 1354, 1360 (11th Cir. 1999) ("plaintiffs, who have been discharged from a previously held position, do not need to satisfy the McDonnell Douglas prong 'requiring proof of qualification'") (citation omitted); Gregory v. Daly, 243 F.3d. 687, 696 (2nd Cir. 2001) (showing that plaintiff "*possesses the basic skills necessary for performance of [the] job*" satisfies second prong) (emphasis in original; citations and internal quotation marks omitted).  Defendant's assertions regarding plaintiff's actual conduct and job performance are properly considered "only *after* a prima facie case is established, when the court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination."  Damon, *supra,* 196 F.3d at 1360 (emphasis in original).[3]

Defendant has asserted its legitimate, nondiscriminatory reasons as the basis for plaintiff's discharge, through the testimony of Mike Reed and Mike Mooney.  Defendant's Motion ¶12.

---

[3]Of plaintiff's four supervisors  – Andre, Buchanan, Kesling and Reed – all but Reed are on record that plaintiff was a qualified and high-performing Plant Operator.  *Supra* ¶¶5, 6, 9.  Only Reed, whose ethnic bias against plaintiff is well documented, *supra* ¶10, claims there were problems with plaintiff's performance. Even Reed grudgingly admitted that plaintiff was *qualified* for the job; he testified that when he began supervising plaintiff in January of 2000, plaintiff was "doing fine" – the plant was running, the asphalt was going out, and plaintiff was "doing his job."  R164 Reed 68:3-24.

The burden thus shifts to plaintiff to show that there are genuine issues of material fact as to whether defendant's proffered reasons were pretexts for discrimination. Plaintiffs can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981), *citing* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973).

Pretext may be shown directly in a number of ways, including defendant's more favorable treatment of a similarly situated white employee ("comparator"), defendant's discriminatory treatment of plaintiff throughout his employment, defendant's treatment of other protected class members, biased remarks by defendant's decision-maker, defendant's reaction to plaintiff's legitimate anti-discrimination activities, defendant's "policy and practice with respect to minority employment," and defendant's departure from its own procedures. McDonnell Douglas, *supra,* 411 U.S. at 804-05; Patterson v. McLean Credit Union, 491 U.S. 164, 187-88 (1989); Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 152-53 (2000).

Plaintiff has produced evidence that similarly situated white comparators Fanz and Kell, the latter of whom held the same position as plaintiff under the same supervisor, were treated more favorably, in that they were warned, both orally and in writing, for performance deficiencies, whereas plaintiff was not, and were allowed to resign in good standing, whereas plaintiff was not. *Supra* ¶¶4, 13, 20. The first time Kell failed at the Plant Operator position, in October of 1999, he was allowed to return to his former position of Groundsman; the second time, he was told that he should look for other work, and eventually resigned. *Supra* ¶¶4, 13. The first time plaintiff allegedly failed, he was fired.

He has produced evidence that defendant subjected him to discriminatory treatment throughout his employment, including Mooney's refusal to hire him as a mechanic; the racial slurs and harassment directed at plaintiff by co-workers and his supervisors, Reed and Overcash; and Reed's removal of

15

plaintiff's company truck privileges. *Supra* ¶¶1, 2, 9, 10.

He has produced evidence of defendant's discriminatory treatment of other members of his protected class, including racial slurs and threats directed at Cuban truck drivers and other Cuban employees by his own and other supervisors, including Reed, Mooney and Overcash. *Supra* ¶¶2, 9, 10.

He has produced evidence of biased remarks by the decision maker, Reed. *Supra* ¶10. Defendant admits that Reed was the decision maker. Defendant's Motion at 6, ¶11.

He has produced evidence of defendant's negative reaction to his legitimate anti-discrimination activities, including its ineffective responses to his many complaints to Kesling and Allen, and Reed's hostile reaction to his complaints. *Supra* ¶¶9, 10.

He has produced evidence of defendant's policy and practice with respect to employment of Cubans, in that its managers either tolerated (Kesling, Allen, Andre) or participated (Reed, Mooney, Glor, Overcash) in a racially hostile environment at Pavex for Cuban workers. *Supra* ¶¶2, 9, 10.

He has produced evidence that defendant departed from its own procedures in that it followed its progressive discipline policy for other employees, but not for plaintiff. *Supra* ¶¶4, 13, 20.

Plaintiff has also shown pretext <u>indirectly</u> through evidence that the defendant's proffered reasons are unworthy of credence. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 509 (1993). In attempting to prove pretext in this indirect manner, plaintiff must show that all of the reasons asserted by defendant are unworthy of credence. <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1539 (11th Cir. 1997); Defendant's Motion at 13. Here plaintiff has produced evidence which creates genuine issues of material fact as to whether each of defendant's asserted reasons is worth of credence. *Supra* ¶12.

Finally, plaintiff was regarded as a highly competent and valuable employee until the biased Reed became his supervisor. *Supra* at 16 n.3. This is commonly regarded as circumstantial evidence of

pretext.  Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002), *citing* Damon, *supra,* 196 F.3d at 1361.[4]

2.  Mixed Motive Analysis

Mixed motive analysis is applicable to plaintiff's Title VII claims because plaintiff has identified evidence that his national origin and ancestry were a motivating factor in his discharge.  Desert Palace v. Costa, 539 U.S. 90, 101-02 (2003).  Contrary to defendant's position (Defendant's Motion at 11, 14-15), it is no longer necessary, after Costa, for the Court to determine whether such evidence is "direct" or circumstantial; mixed motive analysis is applicable in either case.  539 U.S. at 98-99.

Under mixed motive analysis, plaintiff establishes a Title VII violation by showing that national origin "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. §2000e-2(m).  Such a showing shifts the burden of persuasion – not production – to the defendant to show that it would have made the same decision, absent the discriminatory motive.  Costa, *supra*, 539 U.S. at 93.  Even if defendant prevails on this issue, it can avoid liability for damages and reinstatement, but not for declaratory and injunctive relief,  attorney's fees and costs.  42 U.S.C. §2000e-5(g)(2)(B).

In Costa, there were no statements by the decision maker in close proximity to the discharge and specifically relating to the discharge, as had been required for "direct evidence" cases; in rejecting the requirement of "direct evidence," the Court held that plaintiff established that sex was a motivating factor in her discharge through circumstantial evidence that she had been treated less favorably in the past than male employees and that defendant had tolerated sex-based slurs directed at her.  539 U.S. at 96.  Here the evidence of slurs and harassment against plaintiff, as well as unequal treatment is much stronger.  Thus there are genuine issues of fact as to plaintiff's discharge under a mixed motive analysis.

---

[4]In Rojas, the Court held that the inference of discrimination was not appropriate, without more, on the facts of that case, because plaintiff did not dispute the facts regarding his conduct; therefore, the new supervisor's assessment of the admitted conduct could have resulted from his imposing different, albeit legitimate standards.  285 F.3d at 1343.  In the case at bar, however, the facts regarding plaintiff's performance are disputed, and the trier is entitled to make the normal inference that the adverse action is the result of supervisor bias.

## II.  Retaliatory Discharge

Defendant apparently does not dispute that plaintiff engaged in protected activity and was discharged, but disputes that there was a causal connection between the two.  Defendant's Motion at 18 n.8.  The causation element of a prima facie case is met by showing that the decision maker was aware of plaintiff's protected activity, and that the discharge was "not wholly unrelated" to the protected activity.  Shannon v. BellSouth Communications, 292 F.3d 712,  716 (11th Cir. 2002), *quoting* Gupta v. Florida Board of Regents, 212 F.3d 571, 590 (11th Cir. 2000).

Here plaintiff complained to his supervisor, Plant Manager Reed, about discrimination against Dusty Apton, an African American employee, and harassment of himself by Fanz because of his national origin.  *Supra* ¶10.  As defendant admits, plaintiff also approached Reed in March of 2000 about the evaluation he had been promised as a prelude to promotion to Plant Manager.  Defendant's Motion at 7-8 ¶10.  Reed reacted with hostility to the Apton complaint, and blew off the Fanz complaint and the request for the evaluation.  *Supra* ¶10.  Reed was the decision maker.  The complaints occurred in the narrow window of time between Reed's arrival in January and plaintiff's dismissal on April 13, 2000, and were thus in "close temporal proximity" to the discharge.  Shannon, *supra*, 292 F.3d at 716-17.

## III.  Discrimination in Hiring

Defendant recognizes that plaintiff makes a hiring claim, but fails to argue for summary judgment on it.  Defendant's Motion at 1.  Plaintiff states a prima facie case of hiring discrimination in that (1) he is Cuban; (2) he applied for the mechanic position and was qualified, *supra* ¶1; (3) he was rejected, Defendant's Motion at 2 ¶1; and (4) after his rejection, the position remained open, as Mooney was "always looking for good mechanics."  *Id.;* McDonnell Douglas, *supra*, 411 U.S. at 802.

Defendant asserts a legitimate, nondiscriminatory reason for its action, stating that "Mooney did not hire Perez as a shop mechanic, however, because Perez did not own his own his own tools – a requirement for that job."  Defendant's Motion at 2 ¶1.  Plaintiff demonstrates that the asserted reason

is in fact a pretext for discrimination, in that (1) it is unworthy of credence, in light of Buchanan's testimony that in recommending plaintiff, he told Mooney that plaintiff owned his own tools, *supra* ¶1; and (2) Mooney's biased remarks support the inference that he acted out of bias. *Supra* ¶9. Thus are there genuine issues of material fact on this claim, precluding summary judgment.

## IV. Hostile Work Environment

Defendant argues that plaintiff has failed to show that the hostile work environment was sufficiently "severe or pervasive." Defendant's Motion at 19-20. It is beyond dispute that plaintiff subjectively regarded the harassment as both severe and pervasive. *Supra* ¶¶9, 10, 12 (plaintiff made numerous complaints to management, and on some days was so upset by the harassment that he could not go into the time clock trailer to punch his card).

In evaluating objective severity, courts focus on four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Miller v. Kenworth of Dothan, 277 F.3d 1269,1276 (11th Cir. 2002) (citations omitted). Courts do not require that plaintiff demonstrate that each factor is present, but look at the "totality of the circumstances", including the relative strength of each factor. *Id.*, *citing* Mendoza v. Borden, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*); indeed, "no single factor is required." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

Here the harassment by Fanz and the other white drivers was "constant", like "breakfast" each day; whenever he went to punch in, "it was the same thing". *Supra* ¶9. The harassment by Reed, plaintiff's supervisor, occurred "all the time", more times than plaintiff could count. *Supra* ¶10.

The harassment was severe. It included crude slurs and cursing, by Reed, Foreman Overcash, and the white truck drivers, including Fanz' hostile and biased comments such as, "You fucking Cuban. You fucking spic. Go back to Miami. What the fuck are you doing here." *Supra* ¶¶2, 9-10. Plaintiff

described the slurs he suffered as "the nastiest thing that could be." R161 Perez 191:3-9.

The harassment was humiliating, and not merely an offensive utterance. In particular, Reed humiliated plaintiff by taunting and mimicking him, acting as if he did not understand him, and repeatedly calling him a "fucking Puerto Rican," even though he knew he was Cuban. *Supra* ¶10. The comments of Fanz and others in the time clock trainer and at the pizza lunch were all the more humiliating because they were made in front of others. *Supra* ¶¶9, 12.

The harassment interfered with plaintiff's work performance, in that Fanz attempted to create conflict among plaintiff's subordinates, and the slurs caused plaintiff to avoid the time clock trailer by failing to punching his time card on certain days. *Supra* ¶¶9, 12.

### V. Intentional Infliction of Emotional Distress

The facts herein meet the standard of outrageousness required under Florida law. Liberti v. Walt Disney World Co., 912 F.Supp. 1494, 1506 (M.D.Fla. 1994)(sexual harassment which involved employee peeping at and filming other employees in dressing room, and employer's inadequate response to complaints thereof); Byrd v. Richardson-Greenshields, 552 So.2d 1099, 1100, 1105 (Fla. 1989) (sexual harassment which involved verbal abuse and some touching, but no physical injury); Lashley v. Bowman, 561 So.2d 406, 408-09 (Fla. 5th DCA 1990) (restaurant owner had plaintiff arrested when she repeatedly refused to pay for undercooked lobster tail); Nims v. Harrison, 768 So.2d 1198, 1199 (Fla. 1st DCA 2000) (racial slurs toward African American teacher in student newsletter).

WHEREFORE, there are genuine issues of material fact as to all of plaintiff's claims and plaintiff respectfully prays that Defendant's Motion be denied.

Respectfully submitted,


_____/s/ Peter F. Helwig_____
Peter F. Helwig, Trial Counsel
Florida Bar No. 0588113
Adria Lynn Silva

Florida Bar No. 0137431
Harris & Helwig, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, Florida 33813
Telephone:  (863) 648-2958
Facsimile:  (863) 619-8901

Jack Scarola
Florida Bar No. 169440
Searcy, Denney, Scarola, Barnhardt & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL  33402
Telephone:  (561) 686-6300
Facsimile:  (561) 684-5816

ATTORNEYS FOR PLAINTIFFS

Certificate of Service

        I hereby certify that on this 27th day of April, 2005 the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which will send a notice of electronic filing to Tracey K. Jaensch, Esq. and Jennifer M. Moore, Esq., Ford & Harrison, 101 East Kennedy Boulevard, Suite 900, Tampa, Florida 33602.

_____/s/ Peter F. Helwig_____
Peter F. Helwig