UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MIGUEL PEREZ, *et al*,

        Plaintiffs,

vs.                                               **Case No. 8:01-CV-69-T-27MSS**

PAVEX CORPORATION,

        Defendant.

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Renewed Motion to Strike Plaintiffs' Expert Report (Dkt. 265) and Plaintiffs' Memorandum in Opposition (Dkt. 268). Upon consideration of the parties' briefs and after hearing oral argument from counsel, Defendant's renewed motion is **GRANTED** in part and **DENIED** in part.

This action was initiated by twenty-six individuals alleging various forms of race discrimination against Pavex Corporation, the owner of an asphalt production facility in Bartow, Florida. Nine plaintiffs remain in the case: Frank Flournoy, Angria Walker, Leroy Abrams, Emanuel Walker, Carlos Clem, Willie Bates, Frank Smith, Patricia Ford and Miguel Perez (collectively "Plaintiffs"). Eight of the remaining Plaintiffs are African Americans and one is Hispanic. Plaintiffs' discrimination claims include disparate treatment, discriminatory discharge, hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Florida Civil Rights Act. Some of the Plaintiffs also allege state claims

for intentional interference of emotional distress, assault, battery and negligent hiring.[1] (Dkt. 212).

Defendant has moved for summary judgment on all of the Plaintiffs' remaining claims. In response to Defendant's motions for summary judgment, Plaintiffs have filed the expert report of Dr. Jeffrey S. Kane. (Dkt. 268, Ex. 1). Dr. Kane offers the following five opinions regarding discrimination at Pavex during the period from January 1996 through December 2001:

(1) "Blacks have been employed at greatly disproportionate rates in the most aversive jobs . . . and have been systematically restricted in their employment in the more desirable jobs at this company location [Pavex-Bartow]";

(2) "Blacks are paid significantly less than Whites at Pavex-Bartow, despite being assigned to the most physically demanding work";

(3) "Blacks have been given absolutely no access to higher echelon (i.e., supervisory/managerial, technical, and administrative) jobs at Pavex-Bartow despite their appreciable presence in the Company's workforce and in the local population";

(4) "The present percentage of Blacks employed at Pavex-Bartow (9.5%) is most likely the result of a biased selection process which favors Whites over Blacks"; and

(5) "Rules for discharge have most likely been enforced more stringently for Blacks than for Whites, with the result that Blacks have suffered disproportionately more involuntary terminations than Whites."

(Dkt. 268, Ex.1, pp. 6-7).

Defendant moves to strike Kane's report in its entirety, arguing the report lacks probative value because Kane's analysis: (1) is fatally flawed by his reliance on incomplete and independently unverified data, baseless assumptions and improper comparisons that are not recognized in the field of statistical analysis and (2) does not aid the trier of fact in determining the claims of the African-American Plaintiffs in this case. (Dkt. 265, pp. 2-3). Defendant contends all five of Kane's

---

[1] The parties dispute whether Plaintiffs have properly alleged discrimination claims under a pattern and practice theory. For the reasons discussed *infra*, this Court finds that Plaintiffs have sufficiently alleged pattern and practice claims and that a decision on the merits of these claims is not appropriate at this stage of the litigation.

conclusions fail to meet the standard for scientific expert opinion set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

### Applicable Standard

Before any scientific expert testimony can be admitted as evidence at trial pursuant to Fed. R. Evid. 702, this Court must act as a gatekeeper and screen the proffered evidence to ensure that it is both relevant and reliable. *Daubert*, 509 U.S. at 597. Scientific expert testimony is properly admitted when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;[2] and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1999). Additionally, this Court must consider the circumstances in this particular case in determining whether the proffered expert testimony is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The party seeking to admit the expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

---

[2] Under *Daubert* and its progeny, the Court must make a preliminary assessment of "whether the reasoning or methodology underlying expert testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592. In making this assessment, courts may consider (1) whether a theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review and publication and (3) whether the particular technique has a high known error rate and if so, whether there are standards to control for error; and (4) whether it enjoys general acceptance in the relevant scientific community. *Id*. at 593-95. The inquiry is "a flexible one" and the four factors "do *not* constitute a 'definitive checklist or test." *Kuhmo tire*, 526 U.S. at 150.

3

## Discussion

Plaintiffs submit Kane's report in support of the African American Plaintiffs' claims for disparate treatment and pattern and practice discrimination.[3] Statistical evidence is relevant in disparate treatment claims. *See Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir. 1984) (but holding statistics alone cannot establish a case of individual disparate treatment). Statistical data is also relevant in pattern and practice discrimination claims because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices. *See Parker v. Burnley,* 693 F. Supp. 1138, 1153 (N.D. Fla. 1988) (citing *Ardrey v. U.P.S.,* 798 F.2d 679, 684 (4th Cir. 1986)); *see also McDonnell Douglas,* 411 U.S. at 805, n. 19 (noting that a district court may "determine, after reasonable discovery that 'the (racial) composition of defendant's labor force is itself reflective of restrictive or exclusionary practices.'"). Such a discriminatory pattern is probative of motive and can, therefore, create an inference of discriminatory intent with respect to the individual employment decision at issue. *Parker,* 693 F. Supp. at 1153.

As a preliminary matter, this Court finds, over Defendant's objection, that Plaintiffs have alleged a pattern and practice claim, albeit minimally. In the Second Amended Complaint, Plaintiffs allege that Defendant "engaged in a pattern or practice of discrimination against [them]." (Dkt. 114, ¶ 168). The allegations in the Second Amended Complaint sufficiently put Defendant on notice that Plaintiffs intended to proceed under a pattern or practice theory of discrimination.[4]

---

[3] At the hearing conducted on Defendant's motion, Plaintiffs' counsel conceded that Kane's opinions are not relevant to the claims of Miguel Perez and Emanuel Walker.

[4] Notably, none of the Plaintiffs allege a pattern and practice theory of discrimination in their More Definite Statement. (Dkt. 212).

Contrary to Defendant's assertion, at this juncture of the litigation, this Court cannot conclude that the individual pattern and practice claims are improper. The Eleventh Circuit has permitted individual claims of pattern and practice discrimination where the plaintiffs have proven that discrimination "was the company's standard operating procedure". *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th cir.) *cert. denied*, 479 U.S. 883 (1986); *see also Cooper v. Southern Company*, 390 F.3d 695, 719 (11th Cir. 2004) (affirming district court's decision to grant summary judgment on plaintiffs' individual pattern and practice claims after class certification had been denied). Accordingly, Kane's report, if admissible, may be considered in support of the African Americans' claims of disparate treatment and pattern and practice discrimination.

1.  <u>Kane's conclusion regarding alleged imbalance of Blacks in less desirable jobs.</u>[5]

Kane opines that Blacks are employed at a greatly disproportionate rate in the most aversive jobs and have been systematically restricted in their employment in the more desirable jobs. (Dkt. 268, Ex. 1, p. 6). In arriving at his conclusion, Kane used the "chi square" value to measure the difference in success rates of the two relevant groups, Blacks and Whites. This methodology has been recognized as an appropriate analytical tool in employment discrimination cases. *See e.g. Powers v. Alabama Dept. of Education*, 854 F.2d 1285, 1295 (11th Cir. 1988), *cert denied*, 490 U.S. 1107 (1989).

Significantly, Defendant does not challenge Kane's use of the "chi square" value. Rather,

---

[5] Although not expressly challenged by Defendant, this Court finds that Kane is qualified to testify regarding the matters addressed in his expert report. Kane has a Master of Arts degree in Industrial Relations and a Ph.D. in Organizational Psychology. (Dkt. 268, Ex. 1, p. 2). His "speciality" over the past thirty years has "been the development and application of statistical and mathematical methods for understanding and facilitating performance in the workplace." (Dkt. 268, Ex. 1, p. 2). He studied statistics and mathematical psychology in both his master's and doctoral programs and has taught statistics at the graduate level. In addition, he has "published considerable research employing statistics and quantitative methods." *Id.*

Defendant contends Kane's opinion is unreliable and fails to meet the *Daubert* standard because his opinion is based on unfounded assumptions and improper comparisons. Defendant argues Kane's opinion is based on the unfounded assumption that Laborers and Lute Man positions are the most averse and least desirable positions.[6] Defendant contends Kane also fails to consider the proportion of Black employees to White employees and fails to consider the affect of the qualifications of Black applicants for the positions Kane characterizes as "less averse." Defendant argues Kane's failure to take into account the application rate of Blacks compared to Whites for the more and less aversive jobs renders his opinions useless and unreliable.

Based on the parties' submissions, including the record evidence, this Court is not persuaded that Kane's opinion regarding an imbalance of Blacks in less desirable jobs should be excluded. Defendant has challenged the factors Kane allegedly wrongly considered or wrongly failed to consider in analyzing the data, but does not contend his methodology is flawed. "[F]ailure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday,* 478 U.S. 385, 400 (1986). While it appears Kane undertook a limited review of the record evidence in this case, Plaintiff demonstrates that there is testimony supporting his findings. It will be up to the trier of fact to assess, in light of the flaws Defendant has pointed out, what significance to place on Kane's statistics in this regard. *See Kadas v. MCI Systemhouse Corp.,* 255 F.3d 359, 362-63 (7th Cir.2001) (the question of whether statistical evidence is admissible is different from the weight to be accorded to the significance of a particular correlation found by that evidence). Accordingly, as

---

[6] Kane divided the jobs at Pavex into two categories: (1) "those demanding continuous physical exertion on one's feet . . ." and (2) "those which allow the worker to sit, be shaded from the sun, and to rest between periods of physical exertion." (Dkt. 268, Ex. 1, p. 4). Kane concluded that the jobs of Laborer and Lute Man fell into the first category and were the most aversive and that other jobs such as machine operator, supervisor, truck driver, office worker, and plant operator fell into the second category of less aversive and more desirable jobs.

6

to Kane's opinion regarding an alleged imbalance of Blacks in less desirable jobs, Defendant's motion to strike is DENIED.

2.  <u>Kane's opinions regarding pay disparities</u>.

Kane opines that Blacks are paid significantly less than Whites at Pavex despite being assigned to the most physically demanding work. (Dkt. 268, Ex. 1, p. 5). Kane concedes that the "pay rates of individual employees were not present in the employment files that Pavex-Bartow furnished to the [P]laintiffs' attorney." *Id.* In reaching his conclusion he relied on "the pay ranges for virtually all of the non-exempt job titles." *Id.* Kane used the midpoint of the pay range for each job to estimate the pay rate of each job incumbent listed in the company's employment record. Using estimated pay rates, he computed the mean pay rates for Black and White groups. Kane concludes that the differences between the two means was highly significant, leading to his conclusion that there is a strong tendency to limit the employment of Blacks to positions in lower paying jobs. (Dkt. 268, Ex. 1, p. 5).

Defendant contends Kane's assertions regarding pay rates are based on unreliable data and therefore should be excluded. This Court agrees. Within the report, Kane admits that he had no information regarding the compensation for non-exempt jobs so he decided to estimate pay rates himself. (Dkt. 268, Ex. 1, p. 5). Kane offers conclusions about the estimated pay rates he created, with very little insight into how he reached those conclusions. While Plaintiffs explain why Kane choose to rely on the pay ranges, they fail to demonstrate that the data created by Kane is accurate or reliable. In order to be admissible, statistics as well as scientific evidence must be "supported by appropriate validation-i.e., 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590.

7

Kane's opinion regarding pay disparities based on pay ranges he created himself does not meet this necessary threshold of reliability. Accordingly, Defendant's motion to strike Kane's second opinion is GRANTED.

3. <u>Kane's opinion regarding under-representation of Blacks in higher-echelon jobs.</u>

Kane concludes that "Blacks have been given absolutely no access to higher echelon (i.e., supervisory/managerial, technical, and administrative) jobs at Pavex-Bartow despite their appreciable presence in the Company's workforce and in the local population." (Dkt. 268, Ex. 1, p. 7). Plaintiffs concede that Kane's discussion of this point is not based on a statistical analysis, but is merely "a recitation of information." (Dkt. 268, p. 15). Accordingly, Kane's conclusion in this regard cannot be presented as scientific evidence.

4. <u>Kane's opinion regarding the overall representation of Blacks at Pavex.</u>

Kane opines that the "present percentage of Blacks employed at Pavex-Bartow (9.5%) is most likely the result of a biased selection process which favors Whites over Blacks." (Dkt. 268, Ex. 1, p. 7). According to Kane, most of the non-exempt jobs at Pavex did not require a high school education or specialized experience and that the levels of education and experience required would appear to be equally prevalent among Blacks and Whites throughout the country. (Dkt. 268, p. 6). Kane concludes, therefore, that a fair employment system would result in proportions of Black and White employees that approximately matched the proportion of Blacks and Whites in the local population. *Id.*

In arriving at his conclusion, Kane examined the workforce at Pavex as of December 2001. He also determined the representation of African Americans and Whites in the general population

of Polk County and then computed their expected representation in a workforce in which most jobs had no educational requirements and required only manual skill. He concluded that while African Americans represented 16% of the population, they comprised only 9.5% of the Pavex-Bartow work force. Kane opines that the disparity in ratios between the two groups violates the "80 % rule," leading to his conclusion that Blacks are currently being unfairly discriminated against in the hiring at Pavex.[7] (Dkt. 268, Ex. 1, p. 6).

Defendant contends Kane's opinion should be excluded because it is based on incomplete data and because he uses census data inappropriately. Specifically, Defendant contends Kane failed to consider the pool of applicants from which Pavex selected new hires and failed to review Pavex's actual application data to determine the demographics of the applicants. Defendant also challenges Kane's use of the "80% rule," arguing that it has not been accepted for use in connection with pattern or practice claims. Defendant also challenges the reliability of the "80% rule" when used in connection with small sample sizes, such as in this case.

The Court agrees that the reliability of Kane's opinion is suspect. The "80% rule" has been approved by the EEOC as it relates to disparate impact cases. *See* 29 C.F.R. § 1607.4(D). The parties cite to no case and this Court could not find a case applying the "80% rule" in connection with a pattern or practice claim. Neither have Plaintiffs established that the rule is generally accepted

---

[7] The four-fifths, or 80% rule, is taken from the Uniform Guidelines on Employee Selection, which provides:

A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will be generally regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D).

in this context. Moreover, Kane admitted that he had not done a "chi square" or Fischer Exact analysis, but had he done so, he conceded it was questionable whether those more sophisticated statistical computations would achieve the .05 level.[8]  (Kane Depo., p. 163; "whether it would achieve the .05 level . . . is questionable.").

Even assuming that Kane's methodology was sound, the Court concludes that Kane's opinion regarding Pavex's alleged biased selection process would not assist the jury. Not one of the remaining Plaintiffs allege that the initial hiring process at Pavex was discriminatory. Thus, his opinion that the present percentage of Blacks employed at Pavex-Bartow is most likely the result of a biased selection process is irrelevant and would not assist the jury at trial. Accordingly, Defendant's motion to strike Kane's opinion in this regard is GRANTED.

5. <u>Kane's opinion that Blacks suffered disproportionately more involuntary terminations than Whites.</u>

Kane concludes that "the rules for discharge have most likely been enforced more stringently for Blacks than for Whites, with the result that Blacks have suffered disproportionately more involuntary terminations than Whites." (Dkt. 268, Ex. 1, p. 7). According to Kane, the following reasons for termination were classified as involuntary: "No Show," absenteeism, conduct, non-performance, and layoff.[9]  Kane computed the "discretionary involuntary termination ratio" for Black employees as .393 and the ratio for White employees as only .303. Kane surmised that the

---

[8] Kane testified that he planned on conducting a "chi square" analysis in connection with this opinion (Kane Depo., p. 190), but the record does not reflect whether he did so. To date, Kane's expert report has not been amended or supplemented.

[9] Positive drug test terminations were excluded from this group because they were considered by Kane to be nondiscretionary terminations.

10

disparity violated the "80% rule" and thereby supports his conclusion that Blacks were subjected to more stringent discipline rules than Whites. (Dkt. 268, Ex. 1, p. 6). Kane testified that subsequent to filing his expert report he computed the Fischer's Exact score as .089, which is considered a statistically significant result. (Kane Depo., pp. 185-87).

Defendant contends Kane's opinion is unreliable because Kane lumped all terminations together and compared the rate of terminations for Black employees to the rate of terminations for White employees regardless of the reason for termination. Defendant argues this type of comparison is misleading because it fails to consider whether similarly situated employees accused of similar wrongdoing were treated similarly regardless of race. Defendant criticizes Kane for not reviewing any personnel files or verifying the information provided in the spreadsheet made available by Plaintiffs' counsel.

While Defendant's arguments have merit, its criticism goes to the weight of Kane's opinion, not its admissibility. *See Kadas,* 255 F.3d at 362-63 (the question of whether statistical evidence is admissible is different from the weight to be accorded to the significance of a particular correlation found by that evidence); *McMillan v. Mass. Society for the Prevention of Cruelty to Animals,* 140 F.3d 288, 303 (1st Cir. 1998) (statistical analyses are admissible in disparate treatment cases "unless they are so incomplete as to be inadmissible as irrelevant"). Further, while Plaintiffs fail to conclusively demonstrate that Kane's use of the "80% rule" is an accepted methodology in this particular type of discrimination claim, Kane testified that he backed up his analysis by also computing the Fischer Exact Score, which produced a statistically significant result. The Fischer Exact Score is an accepted methodology in discrimination cases. *See e.g. Currier v. United Technologies Corporation,* 326 F. Supp. 2d 145, 155-56 (D. Maine 2004) (admitting statistical

analysis where expert looked at the effect that the reduction in force had on defendant's workforce using Fischer's exact test; explaining Defendant's argument that expert should have worked variables other than age into analysis is appropriately directed to the weight, and not the admissibility, of expert's testimony).

Finally, Kane's opinion in this regard is relevant, as eight of the nine remaining Plaintiffs allege they were discharged for discriminatory reasons. Defendant's motion to strike Kane's opinion that Blacks suffered disproportionately more involuntary terminations than Whites is therefore DENIED. Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. Defendant's Renewed Motion to Strike Plaintiffs' Expert Report (Dkt. 265) is GRANTED in part and DENIED in part.

2. As to Kane's first opinion regarding an imbalance of Blacks in less desirable jobs, Defendant's motion is DENIED.

3. As to Kane's second opinion regarding pay disparities, Defendant's motion is GRANTED.

4. As to Kane's third opinion regarding an under-representation of Blacks in higher-echelon jobs at Pavex, Defendant's motion is GRANTED.

5. As to Kane's fourth opinion regarding the overall representation of Blacks at Pavex, Defendant's motion is GRANTED.

6. As to Kane's fifth opinion regarding the disproportionate number of involuntary terminations imposed on Blacks, Defendant's motion is DENIED.

**DONE AND ORDERED** in chambers this 26th day of January, 2007.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to:
Counsel of Record