**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**MIGUEL PEREZ, *et al.*,**

**Plaintiffs,**

**vs.** **Case No. 8:01-CV-69-T-27MSS**

**PAVEX CORPORATION,**

**Defendant.**
_______________________________/

**ORDER**

**BEFORE THE COURT** is Pavex's Renewed Motion for Summary Judgment as to Miguel Perez (Dkt. 332) and Miguel Perez's Memorandum in Opposition (Dkt. 335). Plaintiff Miguel Perez initiated this action against Defendant Pavex Corporation alleging Pavex discriminated against him based on his national origin (Hispanic) in violation of Title VIII, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981. (Dkt. 212). Specifically, Plaintiff claims Defendant discriminated against him by failing to hire him as a mechanic, by discharging him, and by subjecting him to a hostile work environment. Plaintiff also claims he was discharged in retaliation for opposing unlawful discrimination. In addition, Plaintiff asserts a state law claim for intentional infliction of emotional distress.[1] (Dkt. 212).

[1] Plaintiff filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging Defendant discriminated against him by subjecting him to harassment and discharging him from his position as Plant Operator on the basis of his national origin. After investigating, the EEOC issued a Determination Letter concluding Plaintiff "was subjected to a hostile work environment and discharged because of his national origin, Hispanic." (Dkt. 122, Ex. 9). The EEOC concluded there was "reasonable cause to believe that a violation of Title VII of the Civil Rights Act of 1967, as amended, had occurred." (Dkt. 122, Ex. 9).

Defendant moves for summary judgment on Plaintiff's discriminatory discharge, retaliatory discharge, hostile work environment, and intentional inflection of emotion distress claims.[2] (Dkt. 332). Upon consideration, Defendant's Renewed Motion is **GRANTED** as to Plaintiff's intentional infliction of emotional distress claim and otherwise **DENIED**.

## Factual Background

Plaintiff, a Hispanic male of Cuban descent, initially applied to work at Pavex as a shop mechanic. (Perez Depo., pp. 28-29, 42, 44). Shop Foreman Mike Mooney interviewed Plaintiff but did not hire him. (Mooney Depo., pp. 140-141). According to Mooney, Plaintiff was not hired because he did not own his own tools. (Mooney Depo., p. 142). According to Plaintiff, Mooney made no mention of tools, but told Plaintiff he was not hired because there was a hiring freeze. (Perez Depo., p. 48).

Several weeks later, on August 11, 1999, Plaintiff was hired by Pavex as a dump truck driver. (Perez Depo., pp. 28, 53). He was hired at $8.50 per hour. (Perez Depo., p. 53). Approximately, one week later Plaintiff became a plant groundsman. (Perez Depo., pp. 56, 58). Shortly thereafter, Plaintiff was promoted to plant operator and was given a $1.00 per hour raise. (Perez Depo., pp. 65-67, 343). On September 3, 1999, Frank Andre, Plaintiff's supervisor, rated Plaintiff "above average" in all categories, the highest rating on the evaluation form. (Dkt. 122, Ex. 1).

In October 1999, Quality Control Technician Kenny Buchanan replaced Andre and became Plaintiff's supervisor. (Perez Depo., p. 98). One month later, however, Buchanan resigned because

---

[2] Defendant moves for summary judgment "on all of [Plaintiff's] claims" (Dkt. 332, p. 1) but does not develop an argument as to Plaintiff's claim that he was discriminated against when Defendant did not hire him as a mechanic. There are disputed issues of fact concerning Mooney's decision not to hire Plaintiff, particularly given Buchanan's testimony that he told Mooney that Plaintiff had his own tools. Plaintiff acknowledges that the position remained open but points out that Mooney was "always looking for good mechanics". (Dkt. 335 at p. 18.). This claim remains for purposes of trial.

he wanted a raise, which Pavex would not approve. (Perez Depo., p. 98). After Buchanan left, sometime in November 1999, Area Manager Jimmy Allen gave Plaintiff the keys to the company truck and told him that he would be the next Plant Superintendent. (Perez Depo., pp. 98-99). However, the Plant Superintendent position was not filled. (Perez Depo., p. 186). Rather, the Plant Superintendent duties were split, with Plaintiff undertaking some new responsibilities. The remaining duties were assigned to various individuals in other positions. (Perez Depo., pp. 71-72, 178-181; Allen Depo., pp. 86, 88; Kesling Depo., p. 79-80).

In December 1999, when Plaintiff had not received a promotion or another raise, he told Grading Division Manager Donald Kesling that he wanted a raise and that he had looked at other job options. (Perez Depo., pp. 184-185; Kesling Depo., p. 146). Kesling got approval for a $2.00 per hour raise and told Plaintiff that he would be evaluated again in ninety days in order to determine whether he would become a salaried Plant Superintendent. (Perez Depo., pp. 183-184, 378; Kesling Depo., p. 146). That same month, Kesling gave Plaintiff the highest rating in all categories on his performance evaluation and noted that Plaintiff was a "highly skilled Plant Operator & Mechanic." (Dkt. 122, Ex. 4; Kesling Depo., p. 146).

In January 2000, Orlando Plant Superintendent Mike Reed became Plaintiff's supervisor. (Perez Depo., pp. 182, 378; Reed Depo., p. 16). The company truck that Perez had been using to drive to and from work was assigned to Reed. (Perez Depo., pp. 415-416). According to Plaintiff, the reassignment of the truck to Reed was discriminatory. (Perez Depo., pp. 417-18). However, Plaintiff testified that Reed needed a truck to travel back and forth between Bartow and Orlando and that Plaintiff, as Plant Operator, was generally required to remain at the Plant in the control room most of the day. (Perez Depo., pp. 217, 416). According to Pavex Northern Division President Glen

Monek, only salaried supervisors and Quality Control Technicians were assigned trucks to take home. (Monek Depo., p. 131). Plant Operators, such as Plaintiff, were not assigned a truck. (Monek Depo., p. 131).

In late March 2000, Plaintiff asked Reed for a raise. (Perez Depo., p. 103). Reed told Plaintiff that there was a wage freeze in the company and that nobody was getting a raise. (Perez Depo., p 103).

*Allegations of Harassment*

Plaintiff contends that throughout his employment he was harassed because he was Hispanic and of Cuban descent. According to Plaintiff, while making his first delivery of asphalt at Pavex, he damaged some fresh asphalt. (Perez Depo., pp. 18-19). Foreman Terry Overcash jumped up on his truck and yelled "what the fuck do you think you're doing." (Perez Depo., p. 18). According to Plaintiff, Overcash berated him for "talking with [his] fucking Cuban buddies." (Perez Depo., p. 18). Plaintiff was aware that Overcash used derogatory racial slurs toward other Hispanic drivers because the drivers had complained to Plaintiff that Overcash called them "fucking Cuban motherfuckers" and threatened to "kick [their] ass[es]." (Perez Depo., p. 156). Plaintiff told Kesling that Overcash was verbally abusing the truck drivers. (Perez Depo., p. 157). Kesling said he would look into it, but "nothing came about." (Perez Depo., p. 157).

Plaintiff also witnessed Mike Reed, his supervisor, regularly use racial slurs. Reed called Plaintiff a "fucking Puerto Rican all the time" and mimicked him "like as if [he] was stupid all the time." (Perez Depo., pp. 274-5). According to Plaintiff, he told Reed he is Cuban, not Puerto Rican, but Reed continued to call him Puerto Rican because "Puerto Ricans are more stupid than Cubans."

(Perez Depo., pp. 275, 384).[3] According to Plaintiff, Reed would routinely say "[l]isten fucking Puerto Rican . . . I don't understand what you're saying," "[h]ey, fucking Puerto Rican. . . . [g]et your ass over here," and "[s]peak English, you fucking Puerto Rican." (Perez Depo., pp. 277, 382).

Plaintiff also heard Reed use the term "nigger." On one occasion, after an African American employee threatened to leave the Plant, Reed told Plaintiff, "[t]hat fucking nigger . . . [y]ou can't give a nigger a high-ranking job because it goes to his head." (Perez Depo., p. 272). Plaintiff also heard Reed call someone from the Bahamas a "sand nigger." (Perez Depo., pp. 273-4). According to Plaintiff, Reed treated Caucasian employees more favorably than African American employees. (Perez Depo., pp. 254, 278-82). Plaintiff was bothered by Reed's use of racial slurs. (Perez Depo., p. 277). Plaintiff told Reed that he did not like his use of racial slurs, but he did not report it to anyone else in management. (Perez Depo., p. 387).

According to Plaintiff, a group of truck drivers, including Charlie Fanz, Ray Darling and Tom Walker, made demeaning comments to Plaintiff each morning while they sat around the coffee machine where employees had to clock-in. (Perez Depo., pp. 114-15). Paving Superintendent Tom Glor was present. (Perez Depo., p. 114). Plaintiff testified that the demeaning names, such as "nigger," "fucking Cuban" and "Cuban lover," were used everyday, "it was constant." (Perez Depo., p. 116). Sometimes Plaintiff would not clock-in because he did not want to deal with the harassment. (Perez Depo., p. 196). If he did not clock-in, "Sue" or "Faye" would call and ask him what time he came in and write it down for him. (Perez Depo., p. 212).

---

[3] Q: Are you saying that Mike Reed would call you Puerto Rican because he was implying that Puerto Ricans are more stupid than Cubans?

A: Right.

(Perez Depo., p. 275).

On one occasion, Ray Darling said he hoped an approaching hurricane would hit Miami "and wipe[ ] it out so we can take care of all them fucking Haitians and fucking Cubans out there, just wipe them all out." (Perez Depo., p. 196). Plaintiff testified that co-worker Jim Lewis called him a "spic all the time." (Perez Depo., p. 306). According to Plaintiff, Lewis did not think Plaintiff should be working in the tower because he believed "it was a white man's world." (Perez Depo., pp. 306-07). Lewis would tell Plaintiff to "[g]o back to where [he] came from" and would say "[s]pic, where's my fuel sheet?" (Perez Depo., p. 306).

Plaintiff testified that early on, Frank Andre warned Plaintiff that Charlie Fanz did not like Cubans. (Perez Depo., p. 81). According to Plaintiff, Fanz's use of racial slurs was "constant." (Perez Depo., p. 191). Fanz called Plaintiff a "fucking Cuban" in front of supervisors Andre and Glor. (Perez Depo., pp. 82, 196). Fanz also called Plaintiff "spic" and told him he was not qualified to run the Plant. (Perez Depo., pp. 82-83). After a Hispanic employee was terminated because he failed a drug test, Fanz told Plaintiff that there was "one Cuban down and one to go." (Perez Depo., p. 86). Fanz also told his daughter, Cathy Fanz, not to eat pizza that Plaintiff bought because he was not going to have her eat pizza with a "bunch of damn Cubans and fucking niggers." (Perez Depo., pp 246-48).

According to Plaintiff, Fanz "would make it impossible for [Plaintiff's] job to take place" because he would "go in there and mess with different people, just to stir up stuff." (Perez Depo., p. 83). According to Plaintiff, Fanz told Joe Hickman that they needed "to get that fucking Cuban out of the tower" because Fanz wanted "to run the show." (Perez Depo., p. 83). Plaintiff told Kesling that he did not want Fanz working in the Plant, but "[Kesling] had more power than [Plaintiff] did. . . . [Kesling] ran the show." (Perez Depo., p. 249).

In December 1999, Plaintiff complained about Fanz's harassment to Jimmy Allen. (Perez Depo., pp. 83, 195-96, 199). Allen said he would talk to Fanz and keep him away from the Plant. However, Allen left Pavex one month later. (Perez Depo., p. 199). In January or February 2000, Plaintiff complained to Kesling about Fanz's harassing comments. (Perez Depo., pp. 189, 200). Plaintiff told Kesling that he "was tired of hearing all the racial remarks . . . [and] that [Fanz] needs to respect [him] and he needs to stay out of the plant." (Perez Depo., pp. 190-91). Plaintiff told Kesling that Fanz called him a "fucking Cuban," "fucking spic," and told Plaintiff to "go back to Miami." (Perez Depo., p. 191).

After he complained to Kesling, Fanz stopped making comments for a week or two, but then "it started again." (Perez Depo., pp. 200-1). Plaintiff complained to Kesling at least two other times. (Perez Depo., pp. 201, 204). One time he told Kesling that Fanz called African American employee "Emmanuel baboon and fucking nigger." (Perez Depo., pp. 201-3). According to Plaintiff, Kesling said he would keep Fanz out of the Plant, but nothing changed. (Perez Depo., pp. 203-4). Another time, Plaintiff and several other employees complained to Kesling that Fanz said the Plant had been broken into because of all the "fucking niggers and Cubans, there's too many in here." (Perez Depo., pp. 204-5). Plaintiff did not know whether Kesling disciplined Fanz, but Pavex employees refused to take Fanz's delivery of asphalt. (Perez Depo., p. 205). According to Kesling, Fanz was suspended for the day and issued a written warning. (Kesling Depo., pp. 77-78, 83-84). Kesling told Fanz that Pavex would not tolerate his behavior and if he could not refrain "then he had to leave." (Kesling Depo., p. 78).

Plaintiff also complained to Reed about Fanz's use of racial slurs. (Perez Depo., pp.189-99, 387-88). Reed told Plaintiff "[j]ust don't pay no attention to him. He ain't nothing." (Perez Depo.,

p. 387). According to Plaintiff, despite his frequent complaints, "nothing was ever done" and "the more [he] complained, the more heat [he] got" from Fanz. (Perez Depo., pp. 250, 254, 256). Plaintiff believed Fanz would retaliate against him because after he complained, Plaintiff noticed paperwork ("plant reports" and "tickets") disappeared from the office. (Perez Depo., p. 256).

Fanz's personnel records indicate that on July 14, 1999 and January 19, 2000, he was issued a written warning for "using inflammatory language toward Cubans & Blacks" and for "verbal abuse to hourly employee causing employee to quit." (Dkt. 122, Exs. 6, 7). Fanz continued to work as a Pavex employee until he resigned on January 12, 2001 to "accept other work." (Dkt. 122, Ex. 8).

*Plaintiff's Termination*

According to Monek, Pavex follows a policy of "progressive discipline," whereby all but the most serious offenses are dealt with through discipline of increasing or progressive seriousness. (Monek Depo., pp. 187, 188). Generally, discipline would begin with a verbal warning, followed by a written warning, suspension, and ultimately termination if the problem continued. (Monek Depo., pp. 187-88). Written warnings were placed in employees' personnel files. (Monek Depo., p. 189).

On April 13, 2000, Reed fired Plaintiff. (Perez Depo., p. 103; Reed Depo., pp. 58, 78).[4] According to Reed, Plaintiff adopted an "I don't care attitude" after he was denied a second raise. (Reed Depo., p. 59). Reed had given Plaintiff the responsibility of repairing the wet scrubber in February and by the second week of March, it still had not been done. (Reed Depo., p. 58). Reed

---

[4] As Plaintiff's supervisor, Reed had the authority to terminate Plaintiff. (Reed Depo., p. 81; Kesling Depo., pp. 1639-70). Reed discussed his decision to fire Plaintiff with Glen Monek. (Reed Depo., p. 78). According to Reed, Monek did not ask any questions, but told Reed to "take care of it, do whatever [he] seen fit." (Reed Depo., p. 78).

testified that he discussed Plaintiff's poor maintenance performance with Plaintiff. (Reed Depo., pp. 58-9). A few days later, he told Plaintiff that he needed to cut back on his personal calls because he had received complaints from the people in the office who answered the phones. (Reed Depo., pp. 58-59). Reed also spoke to Plaintiff about his computer errors, namely, charging people incorrectly for asphalt. (Reed Depo., p. 82). Reed also suspected that Plaintiff falsified his time records because his handwritten time records did not match Plaintiff's arrival times as reported by Kesling. (Reed Depo., pp. 45-6). According to Reed, Plaintiff's tardiness was also cause for his termination. (Reed Depo., p. 59). Reed did not give Plaintiff written warnings and did not make written notations of his conversations with Plaintiff. He considered his conversations with Plaintiff to be verbal warnings. (Reed Depo., pp. 62-65).

The day Plaintiff was terminated, Plaintiff asked Reed why he was being fired and Reed said "personal phone calls and job performance," but did not provide any more specifics and said "he didn't want to get into it any more." (Perez Depo., pp. 390-91). According to Plaintiff, no one ever told him he had any performance issues and he was never given a verbal or written warning prior to his termination. (Perez Depo., pp. 350-51, 379). Plaintiff testified that one time Kesling spoke to Plaintiff about incorrectly billing a daily report, but he did not consider that to have been a performance issue. (Perez Depo., p. 221). According to Plaintiff, no one told him he had to clock-in as opposed to having his hours hand written and no one ever told him he was tardy or expressed concern over Plaintiff taking too many personal phone calls at work. (Perez Depo., pp. 212-13, 390).

After Plaintiff was terminated, Pavex promoted Caucasian employee Kenny Kell to the Plant Operator position. (Reed Depo., pp, 41, 93). According to Reed, Kell frequently lost his temper (Reed Depo., p. 94). Kell smashed a window in the control room with his fist, threw his radio across

the counter, and hit another window. (Reed Depo., p. 94). Reed did not discharge Kell for his actions, but gave him a written warning. (Reed Depo., p. 94). Eventually, Reed told Kell he should look for another job because he was "close to being terminated." (Reed Depo., pp. 94-5). According to Kesling, Kell's employment records indicate that Kell left voluntarily for personal reasons, but he told Kell "it's not working out." (Kesling Depo., 176).

## Summary Judgment Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); Fed. R. Civ. P. 56. The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## Discussion

### 1. Discriminatory Discharge

A plaintiff may establish a *prima facie* case of discrimination in three ways: (1) by presenting direct evidence of discriminatory intent; (2) by meeting the test set forth in *McDonnell Douglas* as

applied to circumstantial evidence; or (3) by demonstrating through statistics a pattern of discrimination. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (citation omitted). Plaintiff has not presented direct or statistical evidence of discrimination. Accordingly, his circumstantial evidence of discrimination must meet the test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802-04. The establishment of a *prima facie* case creates a presumption of discrimination. The employer must then offer legitimate, non-discriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual. *Id.* at 802-04.

To establish a *prima facie* case of discriminatory discharge via circumstantial evidence, Plaintiff must establish (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) he was replaced by a person outside his protected class. *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004).

Plaintiff has established a *prima facie* case of discriminatory discharge. He has demonstrated through record evidence that he is a member of a protected class, he was qualified for his position, he was discharged, and that he was replaced by a person outside his protected class, namely, Kenny Kell, who is Caucasian.[5] In turn, Defendant has articulated several legitimate, non-discriminatory

[5] Plaintiff correctly argues that this Court should not take into consideration Defendant's allegations of Plaintiff's poor performance in determining whether he has established that he was qualified for his position for purposes of establishing a *prima facie* case. *See Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354, 1360 (11th Cir. 1999). Defendant's assertions regarding Plaintiff's performance are properly considered "*after* a prima facie case is established, when the court evaluates the pretextual nature of an employer's proffered non-discriminatory reasons for termination." *Id.*

reasons for terminating Plaintiff. Specifically, Defendant contends Plaintiff was terminated because Plaintiff failed to ensure maintenance of the Plant, failed to make requested repairs, was often tardy or left early, received too many personal phone calls, and made numerous computer errors. Reed also suspected that Plaintiff falsified some of his time records. These reasons have been recognized as legitimate reasons for termination of an employee. *See e.g. Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (recognizing poor work performance, failure to follow department procedures, and tardiness as legitimate reasons for termination).

Because Defendant has met its burden of presenting legitimate, non-discriminatory reasons for Plaintiff's termination, Plaintiff bears the burden of showing that the reasons offered were merely pretext. In determining pretext, the trier of fact considers all evidence offered, including "evidence establishing the *prima facie* case and inferences properly drawn therefrom." *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 143 (2000). Pretext may be shown in a number of ways, including biased remarks made by the decision-maker, the defendant's "policy and practice with respect to minority employment," the defendant's favorable treatment of employees outside the plaintiff's protected class, and by demonstrating a departure by the defendant from its normal policies or procedures. *See McDonnell Douglas*, 411 U.S. at 804-05; *Reeves*., 503 U.S. at 152-53.

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact concerning whether Defendant's non-discriminatory reasons for Plaintiff's termination were merely a pretext for unlawful discrimination. There is conflicting evidence regarding Plaintiff's performance, whether he was given verbal warnings by Reed, whether he was given a chance to correct any performance deficiencies, and whether Defendant departed from its normal discipline procedures in terminating Plaintiff. Resolving these discrepancies in the evidence will require the

factfinder to make credibility determinations and weigh the evidence. In resolving motions for summary judgment, these functions are expressly reserved for the jury, not the court. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

In addition, Plaintiff has presented evidence demonstrating that employees outside his protected class, such as Kenny Kell and Charlie Fanz, were treated more favorably in terms of disciplinary procedures. (Dkt. 122, Exs. 3, 6, 7, 8; Reed Depo., pp. 93-96). Moreover, if Plaintiff's testimony is believed, Reed, Plaintiff's direct supervisor and the undisputed decision maker, "constantly" directed demeaning racial slurs toward Plaintiff, such as "fucking Cuban" and "stupid Puerto Rican." While Reed's comments fall short of direct evidence, his repeated use of racial slurs in connection with Plaintiff's job performance constitutes circumstantial evidence that he acted, at least in part, with discriminatory animus when he terminated Plaintiff. *See Jones v. Bessemer Carraway Medical Center,* 151 F.3d 1321, 1323 (11th Cir.1998) ("[l]anguage not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the *prima facie* case"); *Smith v. Horner,* 839 F.2d 1530, 1537 (11th Cir.1988) (allowing evidence of racial slurs to demonstrate pretext).

Viewing the record evidence in the light most favorable to Plaintiff, which is required at this juncture, the evidence is sufficient to create a jury question regarding whether Defendant's non-discriminatory reasons for Plaintiff's termination were pretextual. Accordingly, Defendant's motion for summary judgment on Plaintiff's discriminatory discharge claim is DENIED.[6]

---

[6] Plaintiff correctly argues that there are genuine issues of fact as to Plaintiff's discharge claims under a mixed motive analysis. (Dkt. 335, p. 17). To establish a mixed-motive claim, a plaintiff may show through circumstantial evidence that unlawful discrimination was a motivating factor in the adverse employment decision. *Desert Palace v. Costa*, 539 U.S. 90, 101(2003). Since Defendant has articulated legitimate non-discriminatory reasons for Plaintiff's termination, Plaintiff must accordingly offer sufficient evidence to create a genuine issue of material fact as to whether another "motivating factor" was Plaintiff's national origin. *Rachid v. Jack in the Box*,

2. **Retaliatory Discharge**

To establish a *prima facie* case of retaliation, a plaintiff must establish that he (1) engaged in protected activity; (2) suffered an adverse employment action; and (3) there is a causal connection between the two events. *Shannon v. BellSouth Communications*, 292 F.3d 712, 715 (11th Cir. 2002). Defendant contends summary judgment on Plaintiff's retaliation claim is proper because Plaintiff cannot prove a causal relationship between any of his alleged complaints about co-worker Fanz and his termination. (Dkt. 332, p. 18 n. 8). Defendant also argues Plaintiff fails to rebut its legitimate, non-retaliatory reasons for his termination. (Dkt. 332, p. 18 n. 8).

"To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Gupta v. Florida Board of Regents*, 212 F. 3d 571, 590 (11th Cir. 2000). The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action, but mere temporal proximity, without more, must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Although a close call, Plaintiff has sufficiently established a causal connection between his complaints about Fanz's repeated harassment and his termination on April 13, 2000. Plaintiff testified that he complained to Don Kesling in January *or* February 2000. He also complained to Reed, but did not specify the date of his complaint.

Viewing the evidence in the light most favorable to Plaintiff, he complained to Kesling as

---

376 F.3d 305, 312 (5th Cir. 2004) (quotations omitted). Plaintiff has, even in the face of Defendant's legitimate non-discriminatory reasons, offered sufficient circumstantial evidence to create a genuine issue of material fact as to whether his national origin was a motivating factor in his termination. *Rachid*, 376 F.3d at 315 (an employer's discriminatory comments that relate to job performance and protected characteristic may reasonably be found to establish that the protected characteristic "played a role" in the decision to terminate). It will be for the jury to decide whether legitimate and illegitimate reasons motivated Reed when he terminated Plaintiff.

late as February 2000, approximately two months prior to his termination on April 13, 2000. A two month period of time has been recognized as sufficiently close in proximity to demonstrate a causal connection. *See Robinson v. LaFarge North America, Inc.*, 240 Fed. Appx. 824, 829 (11th Cir. 2007).[7] At a minimum, the temporal proximity is "close" enough to create a genuine issue of material fact as to the element of causal connection. *See e.g. Daugherty v. Mikart, Inc.*, 205 Fed. App'x 826, 827 (11th Cir. 2006) ("[c]lose temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection") (citation and quotation marks omitted).

Lastly, for the reasons discussed in connection with Plaintiff's discriminatory discharge claim, Plaintiff has demonstrated circumstantial evidence sufficient to create a genuine issue of material fact regarding whether Defendant's legitimate business reasons for Plaintiff's termination are pretextual. Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim is DENIED.

**3. <u>Hostile Work Environment</u>**

To establish a hostile work environment claim, Plaintiff must establish that (1) he is a member of a protected group, (2) he has been subjected to unwelcome harassment, (3) the harassment was based on his protected classification, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment, and (5) Defendant is responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.

---

[7] Robinson is an unpublished decision and is thus persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2.

2002); *see also Gupta*, 212 F. 3d at 583.[8]

Defendant contends summary judgment is proper because the use of foul language and racial slurs was neither severe nor pervasive. In determining whether harassment is sufficiently severe or pervasive to alter the terms and conditions of employment, both an objective and subjective test must be met. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). A plaintiff must establish not only that he or she subjectively perceived the environment as hostile and abusive but also that a reasonable person would perceive the environment as hostile and abusive, considering the totality of the circumstances. *Gupta*, 212 F. 3d at 583. The Supreme Court has identified several factors relevant to whether a work environment is objectively hostile or abusive, including (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance. *Harris,* 510 U.S. at 23.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff subjectively perceived his work environment as hostile and that a reasonable person would perceive the environment as hostile. If Plaintiff's testimony is believed, Plaintiff was subjected to frequent racial slurs by his direct supervisor, the same individual who ultimately terminated him. Plaintiff interacted with Reed on a daily basis, in person or by Nextel radio. Reed called him "fucking Cuban" and "fucking Puerto Rican" "all the time" and used these demeaning terms in connection with Plaintiff's job performance. Plaintiff told Reed he was offended by the comments, but according to Plaintiff, the harassment continued. Additionally, on at least one

---

[8] Cases analyzing the requirements of a hostile work environment claim under Title VII are relevant and persuasive in this case, as "both of [ ]statutes [§ 1981 and Title VII] have the same requirements of proof and use the same analytical framework." *Shields v. Fort James Corporation*, 305 F.3d 1280, 1282 (11th Cir. 2002).

occasion, Foreman Overcash directed a racial slur at Plaintiff while berating him about his job performance. This type of supervisor harassment has been found to be sufficiently severe and pervasive. *See Miller*, 227 F.3d at 1277 (frequent, demeaning racial slurs directed at an employee by his supervisor while performing his job sufficiently severe to constitute a hostile work environment).

The evidence also demonstrates that Plaintiff was subjected to frequent racial slurs by co-workers, such as Fanz, Lewis, and Darling. According to Plaintiff, Lewis called him a "spic all the time" and in the course of asking him for work documents. Fanz called him "fucking Cuban" and "spic" "all the time" and sometimes in front of supervisors Andre and Glor. The undisputed record evidence demonstrates that Fanz was disciplined for using "inflammatory language toward Cubans & Blacks" and for "verbal abuse" on more than one occasion. (Dkt. 122, Exs. 6, 7). Even though Fanz was subordinate to Plaintiff, his harassment was arguably severe and altered the terms and conditions of Plaintiff's employment. Plaintiff testified that Fanz would undermine Plaintiff's authority as Plant Operator, claim he was not qualified to run the Plant, and try to cause discord between Plaintiff and his subordinates by calling them "Cuban lovers." Fanz's harassment, according to Plaintiff, made "it impossible for [Plaintiff's] job to take place."

Moreover, the evidence demonstrates that the harassment continued despite Plaintiff's repeated complaints to management, namely, Jimmy Allen, Don Kesling, and Plaintiff's direct supervisor, Mike Reed. *See Miller*, 277 F.3d at 1274 (hostile work environment found where plaintiff's foreman continued to refer to him as "wetback," "spic," and "Mexican motherfucker," even though plaintiff had complained about the name-calling). The Eleventh Circuit has held that "it is repeated incidents of verbal harassment that continue despite the employee's objections that

are indicative of a hostile work environment." *Miller*, 277 F.3d at 1274.

Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the conduct and remarks of Plaintiff's direct supervisor, Foreman Overcash, and Plaintiff's co-workers, were sufficiently severe or pervasive to have created a hostile work environment. Accordingly, summary judgment on Plaintiff's hostile work environment claim is not warranted and Defendant's motion for summary judgment in this regard is DENIED.

**4. Intentional Infliction of Emotional Distress**

In order to prove a claim for intentional infliction of emotional distress, Plaintiff must establish (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the complained of conduct caused the suffering; and (4) the suffering was severe. *See Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277 (Fla. 1985). Conduct is considered "outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 278; *see also Eastern Airlines, Inc. v. King*, 557 So. 2d 574, 576 (Fla. 1990) (citing § 46, Restatement (Second) of Torts (1965)). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Eastern Airlines*, 557 So. 2d at 576 (citing § 46, Restatement (Second) of Torts (1965)). "The issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim of intentional infliction of emotional distress is a legal question in the first instance for the court to decide as a matter of law." *Baker v. Florida National Bank*, 559 So. 2d 284, 287 (Fla. 4th DCA 1990) (citations omitted).

The conduct complained of by Plaintiff, while reprehensible, does not meet the high standard

imposed by Florida courts for intentional infliction of emotional distress claims. *See Vance v. Southern Bell Telephone and Telegram Company*, 983 F.2d 1573, n.2 and n. 7 (11th Cir. 1993); *Williams v. Worldwide Flight Svcs. Inc.,* 877 So. 2d 869 (Fla. 3d DCA 2004); *Lay v. Roux Laboratories Inc.*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980). Significantly, in *Williams*, the court found that the *supervisor*'s use of racial slurs, such as calling the plaintiff a "nigger" and "monkey," did not rise to the level of atrociousness necessary to constitute intentional infliction of emotional distress. *Williams*, 877 So. 2d at 870.[9]

Considering these authorities, the conduct Plaintiff complains of does not meet the standard of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." In turn, the undisputed record evidence fails to establish a *prima facie* case of intentional infliction of emotional distress. Defendant's motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim is therefore GRANTED.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Renewed Motion for Summary Judgment as to Plaintiff Miguel Perez (Dkt. 332) is **GRANTED** in part and **DENIED** in part. Defendant's motion is **GRANTED** as to Plaintiff's Intentional Infliction of Emotional Distress claim and **DENIED** as to Plaintiff's discriminatory discharge, retaliatory discharge, and hostile work

---

[9] *See also Vamper v. United Parcel Service, Inc.*, 14 F. Supp.2d 1301, 1306 (S. D. Fla. 1998) (intentional infliction of emotional distress claim dismissed where, among other acts of hostility, *supervisor* told employees false story about plaintiff and referred to plaintiff as a "nigger" in Spanish); *Mundy v. Southern Bell Telephone and Telegraph Co.*, 676 F.2d 503, 504 (11th Cir. 1982) (intentional infliction of emotional distress claim dismissed where plaintiff's *superiors* threatened to "get" plaintiff or destroy his career, transferred him to less desirable job assignments, gave him unfair negative evaluations and refused to approve reimbursement for legitimate business expenses after plaintiff refused to participate in a scheme to falsify expense vouchers).

environment claims.

**DONE AND ORDERED** in chambers this 7th day of February, 2008.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record